Argued November 1, affirmed December 29, 1960, petition for
rehearing denied January 31, 1961

SUITTER *v.* THOMPSON ET UX

358 P. 2d 267

616

*Harold Banta,* Baker, argued the cause for appellants and cross-respondents. On the briefs were Banta, Silven, Horton & Young, Baker.

*O. Daniel Dearborn, Jr.,* Ontario, argued the cause for respondent and cross-appellant. With him on the brief were Gallagher & Galey, Ontario.

Before McAllister, Chief Justice, and Rossman, Perry, Sloan, O'Connell, Goodwin and King, Justices.

PERRY, J.

This is a suit for a declaratory judgment. It was stipulated by the parties that the interests of the defendants National Industrial Products Corporation, a corporation, The Amalgamated Sugar Company, a corporation, and Del Dewey and Edward Dewey, were not affected by this suit, and they had no interest in its outcome.

The record discloses that the defendants Ivan Thompson and Mary Thompson are husband and wife

and live in the town of Durkee, Oregon; that the plaintiff lives on a ranch some four miles from the town; that both parties were acquainted with a Jack Prescott who did prospecting in the area and had staked out a number of claims thereabout; and the defendant Ivan Thompson (who we will refer to herein as "Thompson") had attempted to interest various parties in the promotion of Prescott's claims, but had been unsuccessful.

Prescott died in November, 1952, and just prior to his death Del and Edward Dewey visited Thompson and inquired about the possibility of quartz in the area. Thompson displayed some samples of quartz and limestone taken by Prescott from his claims. The Deweys became interested in the limestone, had it assayed and then told Thompson they thought they could promote a buyer for the claims. It was agreed that Thompson would relocate the claims and if the Deweys were successful in finding a buyer or someone who would develop the claims they would share equally in the venture, Thompson 50% and the Deweys 50%.

In January, 1953, the defendant Thompson decided he should stake out the claims and make the proper filings. Before he had commenced this undertaking, the plaintiff came to Thompson's store in Durkee and Thompson, knowing plaintiff was familiar with this area, asked plaintiff to assist him in locating some survey corners and promised to compensate him for his help. Plaintiff agreed to this proposal and did assist Thompson to locate the Prescott claims. It was determined, however, that the limestone deposits were not on the Prescott claims, but on land available for entry. The parties then worked out a description for the area containing the limestone deposits and a claim was duly recorded.

The locators of the claim were eight in number,—

618

the defendants Ivan and Mary Thompson, plaintiff, and the balance relatives of Thompson. The claim was called the Eisenhower No. 1. It was agreed by the parties that plaintiff was to be paid for his services. The plaintiff's testimony thereon is as follows:

"* * * as we went down away from there he told me, he says, 'You'll be well repaid for this work,' and I says, 'The way to pay me is to put me down on one of those claims and then if the claim amounts to something, I'll be well repaid, and if it doesn't, you won't be out a cent,' and he says, 'That's what I intended to do,' and he was perfectly sociable and perfectly willing to do it, * * *"

* * * * *

"* * * he told me, he says, 'Some of these other claimholders I will—' —I forget just how he said it, he would buy out or just how he would work it—'but you and Sammy Cordell's part will be in perpetuity,' and he used that very word."

The defendant Thompson's version is as follows:

"A Well, when—the first day that we came down off the hill, I told Mr. Suitter, 'Now,' I said, 'we're—I'm going to make it right with you for your work and pay you for this,' and he said, 'No,' he says, 'you don't have to do that,' he says, 'you put me on the claims,' and I says, 'Mr. Suitter, I've already got my people interested or my people already figured in for the claims,' and I said, 'I'd rather not do that,'—that I'd already got some of my family figured out for that—and he said, 'No,' he said, 'you put me in on a claim,' so I said, 'I don't think I want to do that, Mr. Suitter, because I've already got people figured for that.'

"Q All right. Now, what was the end of it? Did you ultimately agree to put him as a locator on that?

"A Yes, I think we talked of it later on and he kept—said, 'Well, I want you to put me on those claims,' and I said, 'Well, I don't like to do it be-

cause I've already made arrangements with most of my immediate family to do that, and I don't want to do that.' Well, he says, 'You—I want to be put on those claims,' and so when the time came that I put the location notices on, I wrote his name in there."

Thompson denied he stated plaintiff's interest would be in "perpetuity" or that there was any conversation relative to the plaintiff having any interest in the claims subsequently filed upon by Thompson and others.

In May, 1953, the Deweys succeeded in interesting the Morrison-Knudsen Company in the claim, and the company agreed to explore and develop the claim for a one-half interest. The Thompsons and the Deweys agreed to this proposal which required a reduction in their interests. In the absence of any other agreements, this then would result in the Morrison-Knudsen Company having a one-half interest, the Deweys a one-fourth interest, and the original locators a one-fourth interest.

To effect this agreement with Morrison-Knudsen, the plaintiff was requested to and did assign his interest as a locator of Eisenhower No. 1 by quitclaim deed to the Deweys. Plaintiff's statement of what occurred is as follows:

"Mr. Banta and Mr. Dewey brought the deed up home and wanted me to sign this deed, told me that—they told me that the Morrison-Knudsen Company had put the pressure right on it—this had to be signed immediately so they could form a corporation and so they could go ahead and give contracts, that's all. The company had just put the bud right to them; they had to get it done and the time was very short. I believe some time that afternoon was the deadline, and this was about noon

or shortly after—we had eat lunch—and I told him that was an awful short time and that I would like to talk to Mr. Thompson about it at least, or like to go to Ontario, and I don't remember whether I—for sure whether I told him I wanted to see Mr. Gallagher or not, but I told him something there— I either wanted to see Mr. Gallagher or get legal counsel, or something—because Mr. Banta was— of course, he was Morrison-Knudsen's attorney, but Mr. Banta assured me that what I was doing was very regular, nothing out of the way; it was simply being done so we could form this corporation. They had to have a corporation before they could go ahead with their negotiations there, and it was a perfectly normal operation, and I jokingly remarked to Mr. Dewey that he was asking quite a lot coming up and have a man sign away a twenty thousand dollar mining claim for the sum of ten dollars, and he informed me that signing away my—by my signing of that deed would have no effect on any agreement that Mr. Thompson and I was to make in regard to royalties—was to make or had to make."

Sometime after the deed was signed the plaintiff had a conversation with Thompson, the plaintiff's version being as follows:

"* * * They had got this thing to going along pretty good and they started taking out—started shipping rock, and I told Mr. Thompson one day in the store that I thought we should get something down in writing so we'd know who owned what, that's all—get some idea what our share should be—and he agreed to something like that should be done and so he made me an offer. I forget just exactly what he did offer me to start with; I believe it was a tenth or a twelfth, or something like that, and I—there I had been sitting there expecting all the time that I would have at least an eighth, and I just couldn't go along with it at all, and that's when we first started having disagreements, and the more I tried to get an agreement out of the man

the rougher he got. He got so that he just figured he had me where he wanted me and was going to take it all from the way he acted."

Thompson's version of what took place was as follows:

"And Mr. Suitter at that time, when I told him that it would be five years, why, he didn't seem to be—he didn't seem to say anything either way. He just went on about his business just like—he didn't kick about it, so I—"

In December, 1953, plaintiff began receiving checks from Thompson. He cashed the first four, which were marked "Rock Check," "For full payment of Rock Returns to 1-1-54." "Jan. Feb. Mar. 1954 Rock Payment 1/20," and "1/20 Rock Payment month of March," respectively. Plaintiff testified he knew the checks were for 1/20th of the rock payments, but that he did not know that they were computed on the basis of Thompson's share alone and did not include the amount paid Thompson's wife.

On several occasions during the next few months plaintiff and Thompson attempted to come to an agreement but could not. Finally in June of 1954 Thompson acquired a written agreement from his lawyer and when plaintiff visited the store he was asked to step into Thompson's living quarters and sign it. It provided that plaintiff was to receive 1/20th of Thompson's 1/8th share for a period of five years. After reading the agreement, plaintiff refused to sign and this suit was commenced by plaintiff on December 6, 1954.

On May 20, 1953, at the prompting of Morrison-Knudsen, the defendants Ivan and Mary Thompson, with certain other locators, filed on claims adjacent to or in the immediate vicinity of the Eisenhower No. 1. These claims bore the names of Eisenhower No. 2 and

3, Nelson No. 1 to Nelson No. 4. The plaintiff was not named as a locator in any of these subsequent filings.

The plaintiff in this suit sought an adjudication of his interest in and to Eisenhower No. 1 and the subsequent claims filed upon by the defendants, and an accounting of the proceeds of the mines or sales of the claims. His contention as to the subsequent claims is that the relationship of himself and the defendants Ivan and Mary Thompson was that of joint venturers or partners. Therefore, since the other locators with the Thompsons were not owners, but merely being paid from the profits or royalties from the mines, his interest was one-third.

The trial court found that no partnership or joint venture agreement had been entered into by the parties; that plaintiff and defendants had agreed only that the plaintiff was to be paid for services rendered; that for these services they had agreed that plaintiff was to have an interest in the Eisenhower No. 1 claim as a locator; that the interest of plaintiff was a one-eighth of all of the royalties and profits received or to be received by the defendants Ivan and Mary Thompson from their one-fourth interest in the Eisenhower No. 1. A decree was entered accordingly and both parties have appealed.

The defendants Ivan and Mary Thompson contend, first, that the trial court erred in holding there was no agreement entered into whereby Thompson purchased the interest of the plaintiff in the Eisenhower No. 1 location. By this contention Thompson tacitly admits that at the time of the filing upon the Eisenhower No. 1 the plaintiff was the owner of an interest therein. His theory of a purchase is based upon the evidence that he had made arrangements· to pay the other locators a portion of the royalties from the mine

for a period of years; that he had made a proposal to the plaintiff that he should accept for his interest a 1/20th of Thompson's interest in the royalties from the mine for a period of two years; that plaintiff violently refused this offer; that later Thompson made an offer that the royalties should continue for a period of five years, and on this occasion the plaintiff said nothing; that subsequently Thompson sent checks to plaintiff which he accepted.

The defendant Thompson's argument that a contract was entered into for the purchase of the plaintiff's interest in the mine rests on the doctrine of acceptance of defendant's offer by silence.

■ The law is quite clear that an acceptance by silence can only arise when the circumstances existing are such that a duty arises requiring a party to speak. 12 Am Jur 533-535, Contracts § 40; 17 CJS 375, Contracts § 41e.

A duty to speak then can arise only when an offerer has a right to demand some action on the part of the offeree.

■ "No one receiving an overture to change an agreement to which he is a party is obliged to answer the same. His silence cannot be construed as an acceptance if nothing else is shown." *Carnahan Mfg. Co. v. Beebe-Bowles Co.,* 80 Or 124, 128, 156 P 584.

■ There is no showing of any right on the part of Thompson to demand some action by the plaintiff. The defendants, however, seem to see a duty to speak because the plaintiff received and accepted several checks from Thompson bearing the notation "Rock payment 1/20."

■ It is quite true that an accord and satisfaction of

a pre-existing debt may be established by the acceptance of a check with notations thereon, 6 Williston on Contracts, rev ed 1938, 5213, § 1854, but this rule has no application in the matter before us for no debt existed. The trial court found, and we think properly so, that the debt for services was discharged by the agreement of the parties that plaintiff should hold an interest as a locator in a claim. Whether plaintiff received any monetary remuneration depended entirely upon the events of the future.

The defendants' other assignment of error is as follows:

"The Court further erred in attempting to apply the doctrine of unjust enrichment and constructive trusts to the factual situation existing here. In this later regard we contend that whatever rights and liabilities may have arisen from the conveyance by Suitter to the Deweys of his original one-eighth interest in this location, if the Court finds that no agreement with Thompson for his compensation was ever reached, there can be, under the facts, and in view of the stipulation recognizing the ownership of the Deweys to this one-eighth interest and the status of The Amalgamated Sugar Company as a bona fide purchaser thereof, no room for the creation of a trust, express or implied, with relation thereto and hence no basis for granting the plaintiff any relief under the pleadings and issues in this suit."

The basis of this assignment of error lies in the defendants' contention that there never existed any express agreement, nor does the evidence disclose an implied agreement, between the parties whereby a trust relationship could arise.

■ The general rule that guides courts in determining whether or not a situation creates a constructive

trust is found in 4 Pomeroy's Equity Jurisprudence, 5th ed, 119, § 1053:

> "In general, whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never perhaps have had any legal estate therein; and a court of equity has jurisdiction to reach the property either in the hands of the original wrongdoer, or in the hands of any subsequent holder, until a purchaser of it in good faith and without notice acquires a higher right, and takes the property relieved from the trust. * * *"

The defendant Thompson argues that he had no control of the undivided interest of plaintiff and that when plaintiff conveyed his interest to the Deweys, if that transaction was wrongful, the Deweys should be held to answer not the defendants Ivan and Mary Thompson.

The difficulty with this argument is that it fails to take into consideration the overall plan of Thompson (to which plaintiff acquiesced) to develop the mining claim. The record clearly discloses that the plaintiff entrusted Thompson with working out the plans by which each of the party's interest would be used to cause a development of the mine. The Thompsons were permitted by plaintiff to deal with the plaintiff's interest as their own in reducing plaintiff's interest in

the whole for development purposes equally with their own.

It was never understood by any of the parties that the plaintiff was making a sale of his interest to the Deweys. The transfer was a matter of convenience. Del Dewey, who for all intents and purposes was an agent for Thompsons in perfecting the plan for Morrison-Knudsen to operate the mine, did not understand this transaction was a sale or he would have attempted to make the purchase from the plaintiff one of value, not a nominal consideration.

It is also quite patent that the plaintiff's conveyance by quitclaim, although made to Dewey, was in effect a transfer to the Thompsons, for this increased the record title of Thompsons to a one-fourth interest, whereas prior thereto their record title would have been but seven thirty-seconds of the whole.

If we assume the Deweys perpetrated a fraud upon the plaintiff, certainly the Thompsons, who received the benefit of this fraud, acquiesced therein and cannot under any circumstances be considered purchasers for value.

■ There was no error in the trial court declaring a constructive trust.

The plaintiff by his cross-appeal contends the record discloses the plaintiff and defendants were joint venturers and, therefore, the defendants Thompson when they procured the interests of the other locators in the Eisenhower No. 1 became trustees of these interests for his benefit; that, because of this joint venture, plaintiff is entitled to share also in the claims subsequently located by the Thompsons and others.

■ These contentions are without merit for, as the

trial court correctly found, the parties were not joint venturers.

■ Joint venture arises by agreement of the parties. It may be either express or may be implied from the conduct of the parties. *Lane v. National Ins. Agency,* 148 Or 589, 37 P2d 365.

As set out herein, the plaintiff testified he was to be paid for his work and labor in assisting the defendant Thompson in making out the claims. This was to be done by giving him a locator's interest in one of the claims. The record thus discloses only that there existed a cotenancy in the Eisenhower No. 1 claim and a mutual desire to have the claim developed by others.

■ A cotenancy in a mining claim does not make the tenants joint venturers. This is well-established by the fact that a tenant in common is entitled to the use of the whole of the property so long as he does not exclude the other tenants, 3 Lindley on Mines (3rd ed) 1935, § 789a, and the further fact that he is required by statute to account to his cotenants should he receive more than his just share of the rents and profits of the estate. ORS 105.820.

The plaintiff also contends by his cross-appeal that the trial court erred in not allowing interest upon the royalties found due him and not paid by the defendants Thompson.

■ We are of the opinion the trial court correctly determined interest was not due. This, because it appears there was a bona fide dispute between the parties and there was no unreasonable time between the tender of payments and the commencement of the suit. The unreasonable delay lies in the obtaining of a judicial determination of the parties' dispute, which

to a large extent was due to the death of the then presiding judge in the jurisdiction where this cause arose. Under these circumstances it seems reasonable and just that interest should not be allowed. *Emrich v. Emery, et al.*, 216 Or 88, 332 P2d 1045, 335 P2d 604, 337 P2d 972.

The decree of the trial court is affirmed. Neither party to recover costs in this court.