Argued December 2, 1970, reversed and remanded March 31, 1971

RAYSON, *Appellant, v.* RUSH, *Respondent.*

483 P2d 73

*Marvin S. Nepom,* Portland, argued the cause for appellant. With him on the briefs was Leo Levenson.

*Frank L. Whitaker,* Portland, argued the cause and filed a brief for respondent.

Before O'CONNELL, Chief Justice, and McALLISTER, HOLMAN, and HOWELL, Justices.

McALLISTER, J.

This is a declaratory judgment proceeding in which plaintiff seeks a declaration that he is entitled to a 37 per cent interest in a patent on a lawn and parking lot sweeping machine, and in the proceeds of the sale of the patent. He also asked for an accounting of what is due him from money received by defendant or by others on defendant's behalf.

The parties agreed that the case was equitable in nature and it was tried accordingly. After hearing the evidence the trial court held that plaintiff was not entitled to relief, and entered a decree dismissing the complaint. Plaintiff appeals.

■ When a declaratory judgment proceeding is tried as an equitable matter, this court's review is de novo on the record, as in equity proceedings generally. *Oregon Farm Bureau v. Thompson*, 235 Or 162, 178-179, 378 P2d 563, 384 P2d 182 (1963). For this reason, the evidence is set out in considerable detail.

Rayson and Rush became acquainted some time in 1965. Rayson owned a machine shop or camper repair shop; Rush was in some way interested in the sale or promotion of machines for cleaning parking lots, parks, and similar large areas. He had an idea for an improved type of sweeping machine, and in February of 1966 he contacted patent attorneys in connection with his idea. Rayson became interested in the idea, and on March 12, 1966, Rayson and Rush entered into a written agreement concerning the building and manufacturing of such a sweeping machine. The agreement, which was drafted by Rush, provided for the building of a prototype machine, and contains the following paragraph concerning the parties' respective interests in the enterprise:

"The interest in the above machine and the company or corporation formed to handle same shall be divided in the following manner: 51 per cent to [Rush]. 25 percent to [Rayson] and 24 per cent to be kept in reserve to sell for capital to promote the manufacture and sale of this machine, in case we do not need to sell the 24 per cent then 12 per cent of same will go to [Rayson] and 12 per cent to [Rush]. If and when we apply for patent on this

machine, [Rayson] and [Rush] shall each pay ½ of the patent expense. Which later would be returned to them out of the sale of the 24 per cent interest if such were sold. Both parties realize that this is a speculative venture and that a patent may never be issued."

No "company or corporation" was ever formed. It seems to be undisputed that if Rayson has any interest under the agreement, that interest amounts to 37 per cent (the basic 25 per cent assigned to him, plus his half of the 24 per cent reserved for obtaining additional capital).

During a period of two or three months following the date of the agreement a prototype machine was built. The actual designing and labor was done by a Mr. Nipper, who was paid in full by Rayson. While the prototype was being constructed, Rush apparently was continuing with preparations for filing a patent application.

At about the time the prototype was finished, Rayson was seriously injured in an accident; he spent about seven weeks in the hospital and about two months recovering. While he was in the hospital, Rush demonstrated the machine, but made no sales.

Rush testified that shortly after Rayson was released from the hospital, possibly in July 1966, the two men had a conversation in which Rayson said he was financially unable to continue with their arrangement, and they agreed that thereafter the entire matter was up to Rush. Rayson denies ever saying this.

In August, 1966, a patent application was filed in Rush's name; Rush paid the patent attorneys, and made no demand on Rayson for any part of this expense.

In February, 1967, while the patent application was still pending, Rush entered into an agreement with Clifton and David McKenzie of Eugene, in which the McKenzies agreed to pay Rush $10,000, and certain royalties, and Rush granted them an exclusive license to make, use, and sell the sweeping machine. Rayson knew about this agreement, but was not a party to it. Pursuant to this agreement, Rush delivered the prototype to the McKenzies, and they later furnished him with one production model. Rush actually received $9,500 cash from the McKenzies, part of which he paid to Rayson. On March 3, 1967, Rayson signed a receipt acknowledging payment from Rush in the total amount of $2,842.35, representing "37% On Sale of Contract to McK[e]nzie-Cascade Co. Inc", less attorney fees and travel expense in the amount of $656. The computations were made by Rush, who admitted that he used the 37% as a basis to figure plaintiff's share of the money, and that he deducted expenses out of the 37%, but claimed that the payment to plaintiff was a gift. Rush said that after these payments were made to Rayson, he did not feel that Rayson owed him anything more for patent expenses at that time.

In September, 1967, the McKenzies gave Rush notice that they were terminating the manufacturing and sales agreement. A few machines had been produced, but it appears that none had been sold and no royalties had been paid.

In November, 1967, the patent application was rejected. Rayson testified that after the notice of rejection was received, Rush asked him to try to sell Rush's interest in the invention for $5,000. Rush denied making this request.

An amended patent application was later filed, and on April 10, 1968, notice was received that the

amended application had been allowed. According to Rayson, Rush informed him of this development, but made no demand for reimbursement of expenses in obtaining the patent.

Some time after this, Northwest Pacific Corporation acquired one of the sweeping machines which had been built by the McKenzies and became interested in manufacturing it. Late in July or early August, 1968, Rush informed Rayson of a pending deal to sell the patent to Northwest Pacific. According to Rush, he told Rayson at that time that Rayson had no interest in the sale because the arrangement between them had been "out since its inception." At the time Northwest Pacific had purchased the single machine, Rayson had informed them that he had an interest in the invention. Northwest Pacific contacted Rush to inquire about Rayson's interest, and Rush assured them that Rayson's name was not on the patent.

Rayson testified that about this time Rush offered to buy his interest in the patent for $3,000. Rush denied making this offer.

On August 14, 1968, Rush entered a written agreement with Northwest Pacific, selling them all rights to the invention for $40,000. The initial payment was to be $10,000, and the balance was to be paid in installments. Four days later, on August 18, Rayson signed a statement, prepared by Rush, agreeing to the sale of the patent to Northwest Pacific for $40,000, "for my 37 per cent less my share of expenses to attorneys." Rayson testified:

> "Well, I asked Mr. Rush if my name was on the contract; and he told me no.
>
> "I wanted to know what would happen if something happened to him,—what would happen to my

interest in it, seeing my name wasn't on it. He said, 'Well, we can fix that up.' I'll write this up and have it attached to the contract."

Rush testified that he prepared the agreement and had plaintiff sign it so that plaintiff would stop "bothering my customers. But I didn't agree to pay him what's on there." In a deposition, taken by plaintiff before trial, Rush said

"Well, he always wanted to sign something.

"So I—that's how that come about, setting up at Eve's Restaurant over a cup of coffee.

"Well, I says, 'You'd be happy if you got 37 per cent of the deal if I did make it, wouldn't you? I haven't got the money yet. I haven't made the deal yet.'

"Although I had assigned it to them."

He also said in his deposition that he had been advised by one of the patent attorneys to secure Rayson's signature on something to eliminate any controversy in the future.

Out of the initial $10,000 received from Northwest Pacific, Rush sent Rayson a check for $1,000 on October 2, 1968; on the back of the check was written "commission Rogue cleaner." The check was enclosed with a letter saying that the money "will keep the wolf from the door for a few days." Rayson testified that he asked Rush about the meaning of "commission" on the check:

"He informed me it did not make any difference what you called it,—he says, 'You've got the money. What difference does it make what you call it?' "

After checking with an attorney, Rayson cashed the check.

Rush testified that he sent this money to Rayson because he appreciated Rayson's help in the past, and because he knew Rayson needed money and felt sorry for him. He intimated that he called the check a "commission" because he did not want it to seem like charity.

Rush had collected, at the time of trial, about $22,000 from Northwest Pacific, but had paid Rayson nothing since the $1,000 check in October, 1968.

Plaintiff's first point on appeal is that the trial court erred in failing to declare the rights of the parties. He relies on *Cabell et al v. Cottage Grove et al,* 170 Or 256, 130 P2d 1013 (1943) and *Central Or. Irr. Dist. v. Deschutes Co.,* 168 Or 493, 124 P2d 518 (1942). These cases hold that if the complaint in a declaratory judgment proceeding states a justiciable controversy between the parties, it is the court's duty to declare their rights, and that it is error to sustain a demurrer to the complaint even though it appears that the plaintiff is not entitled to any relief.

In this case, the situation is significantly different. The complaint alleged the agreement, the issuance of the patent to Rush, Rush's sale of the patent, and Rush's refusal to pay or account for plaintiff's share of the sale proceeds. The answer alleged several affirmative defenses; the first was that plaintiff failed to comply with the agreement, which became void by its own terms; the second was that the agreement had been terminated by mutual consent. After trial, the court entered "General Findings" stating that the court

"* * * finds generally that the plaintiff has not established that he is entitled to the relief prayed for and that the defendant has established

the allegations of his first and second affirmative defenses."

Although these findings are not in form a declaration of the rights of the parties, they make it clear that the court found plaintiff to have no rights in the patent or the proceeds of its sale under the agreement. The statutes authorizing declaratory judgment proceedings (ORS 28.010-28.160) do not prescribe any particular form for a declaratory judgment or decree. ORS 28.010 provides:

"* * * The declaration may be either affirmative or negative in form and effect, and such declarations shall have the force and effect of a final judgment or decree."

The findings quoted above may leave something to be desired as to form, but we think they adequately discharge the trial court's duty under the cases cited. See *City of Quincy v. Sturhahn*, 18 Ill 2d 604, 165 NE2d 271, 81 ALR2d 1425 (1960); *American Indemnity Company v. Davis*, 260 F2d 440 (5th Cir 1958).

Plaintiff also points out that the decree dismisses the complaint, and that there is no such thing in Oregon practice as the dismissal of a complaint. He cites *Mills v. Feiock*, 229 Or 618, 623, 368 P2d 327 (1962). That case recognized that it is fairly common to speak of dismissing the complaint when what is meant is dismissing the suit. The order in question in that case was treated as an order dismissing the suit, and held erroneous under the circumstances. In this case, if the decree is treated as a dismissal of the suit, it is consistent with the findings. In equity, dismissal of the suit after trial is the proper disposition when it appears that plaintiff is not entitled to any relief. ORS 18.220.

On the merits, plaintiff contends that by the agreement of March 12, 1966, the parties entered into a joint venture, that their joint venture relationship continued until the time of trial, and that plaintiff, under the terms of the agreement and as a joint venturer, is entitled to share in the proceeds of the sale of the patent.

Defendant makes three contentions: (1) That the written agreement created a joint venture only for the purpose of constructing the prototype machine, and that it contemplated the formation in the future of a business entity to handle manufacture and sales. This entity was never formed because plaintiff became physically and financially unable to participate in it; plaintiff, therefore, has no present rights under the agreement. (2) That plaintiff became physically and financially unable to perform his obligations under the agreement, which terminated by its own terms. (3) That the parties mutually agreed to terminate the agreement after the prototype was built but before the patent was issued.

■ The first two of defendant's contentions depend on the construction of the agreement of March 12, 1966.① The first paragraph contains recitals that

---

① "AGREEMENT

"Roy C. Rush hereinafter known as Roy has designed a certain machine for cleaning grassy areas, parking lots and any area where litter accumalates, [sic] and Stanley Rayson hereinafter known as Stanley is desirous of joining Roy in the manufacture and sales promotion of the above machine under the following terms:

"Stanley will furnish all labor for the assembly of this machine, as well as all sheet metal parts, frame metal, soforth, and the labor for shaping, welding and the like.

"Roy will furnish two (2) engines, one (1) rear wheel steer-

defendant had designed a certain machine and that plaintiff desired to join defendant "in the manufacture and sales promotion of the above machine under the following terms". It appears that the word "machine" in this paragraph refers not to a prototype model, but to the design or concept which the parties proposed to manufacture and sell. The next three paragraphs, however, appear to use the word "machine" to mean the prototype; they provide that plaintiff is to furnish all labor, sheet metal parts, frame metal, etc., "for the assembly of this machine"; that defendant will furnish two engines, one rear wheel

---

ing assembly, one (1) propeller, two (2) clutches, one (1) transaxel—3 speeds ahead and one reverse, brake attached, rubber fingers for front end beater, three (3) wheels and tires.

"All other parts and pieces such as hose, bearings, screen, canvas, or any item needed to complete this machine will be paid for on the basis of one half by Roy and one half by Stanley.

"The interest in the above machine and the company or corporation formed to handle same shall be divided in the following manner: 51 per cent to Roy. 25 percent to Stanley and 24 per cent to be kept in reserve to sell for capital to promote the manufacture and sale of this machine, in case we do not need to sell the 24 percent then 12 per cent of same will go to Stanley and 12 per cent to Roy. If and when we apply for patent on this machine, Stanley and Roy shall each pay ½ of the patent expense. Which later would be returned to them out of the sale of the 24 per cent interest if such were sold. Both parties realize that this is a speculative venture and that a patent may never be issued.

"If either party fails to comply with the above agreement in full, then this agreement shall become null and void and each party shall take the respective parts or pieces they have paid for individually and the collective parts or pieces shall be equally divided or sold and the money equally divided.

"This agreement entered into this 12th day of March in the city Portland county Mult State Oregon year 1966.

/s/   R. C. RUSH
/s/   STANLEY C. RAYSON"

steering assembly, one propeller, two clutches, one transaxel with brake attached, rubber fingers for front end beater, and three wheels and tires; and that all other parts and pieces "or any item needed to complete this machine" would be paid for in equal shares. In view of the specific listing of parts the defendant is to furnish, it seems most unlikely that these provisions refer to the production or manufacturing phase of the venture.

The next paragraph provides for a division of the parties' interests "in the above machine and the company or corporation formed to handle same." Since no company or corporation was ever formed, it is important to determine what is meant by the "interest in the above machine." Defendant seems to argue that this paragraph gave plaintiff an interest only in the prototype machine. The more likely meaning is that the "above machine" is the machine referred to in the first paragraph—meaning the design or concept and the assets or rights into which it might develop. This interpretation is supported by the provision in the same paragraph for sharing patent expenses "If and when *we* apply for patent on *this machine*." (Emphasis supplied.)

We think that when the whole agreement is read together, the most reasonable interpretation is that it was intended to provide for the parties' respective interests in any patent which might be obtained on the sweeping machine, even if no organization for production and sales was ever formed.

The next question is whether plaintiff failed to meet his obligations under the agreement. The agreement provides:

"If either party fails to comply with the above agreement in full, then this agreement shall be-

come null and void and each party shall take the respective parts or pieces they have paid for individually and the collective parts or pieces shall be equally divided or sold and the money equally divided."

It is defendant's position that because plaintiff was injured and became physically disabled, first by the accident in 1966, later by a hernia operation in 1967 and still later by some broken ribs, and because he had no money to invest during this period, that plaintiff was rendered unable to comply with his obligations under the agreement.

It is not clear, however, just what obligations defendant has in mind. There seems to be no dispute that plaintiff furnished the parts required of him and paid for the labor in building the prototype model. The only other duty explicit in the agreement is the payment of half the patent expenses. Defendant dealt with the patent attorneys himself; he never made any demand on plaintiff for plaintiff's share of his expenses. Moreover, when he paid plaintiff a portion of the money received from the McKenzie brothers, he deducted, according to his own calculations, plaintiff's share of the expenses to that date. And later, when he prepared for plaintiff's signature the statement agreeing to the sale of the patent to Northwest Pacific, he used the language, "for my 37 per cent less my share of expenses to attorneys." A statement of charges of defendant's attorneys shows that he employed the same firm in connection with both the sale and the patent. We think the "expenses to attorneys" was intended to include patent expenses.

■ Having provided for a deduction of plaintiff's share of expenses from his share of the proceeds of

the sale of the patent, defendant is in no position to claim that plaintiff's right to a share in the profits of their venture should be forfeited because plaintiff has not paid half the patent expenses.

■ Defendant seems to be taking the position that plaintiff had a duty to furnish further capital and services, and that he lost his rights under the agreement when he became unable to do so. If there was such a duty, it is not stated in the agreement, and must be implied. It is clear that the agreement contemplated the operation of a manufacturing and sales business if their enterprise prospered. No details of the operation are spelled out, but the agreement does provide for sale of up to 24 per cent interest in the enterprise if necessary in order to obtain capital. It appears, therefore, that the parties did not intend that the agreement necessarily would be terminated if they were unable to make all necessary contributions themselves. We find no absolute duty which plaintiff has failed to perform.

■ In *McIver v. Norman*, 187 Or 516, 540-542, 205 P2d 137, 213 P2d 144, 13 ALR2d 749 (1949), we approved the rule that, absent exceptional circumstances, a joint adventurer who has contributed to the enterprise cannot be deprived of his share of the profits for a failure to perform all of his duties under the agreement of joint venture. In that case we quoted with approval the following language from *Kaufman v. Catzen*, 81 W Va 1, 10, 94 SE 388 (1917):

"* * * The contract between them was not an entire working contract, made between persons sustaining no fiduciary relation. It was a joint enterprise to be conducted by both of them, wherefore failure of either fully to perform his part did not forfeit his fully acquired interest. Notwith-

standing defaults and omissions, each has an interest in such assets as have been preserved or accumulated."

See, also, 46 Am Jur 2d 57, Joint Ventures § 38.

■ In the present case the agreement provided that if either party failed to comply with the agreement, it would become "null and void." It also provided, however, for a distribution of assets in such an event; there is no evidence that defendant ever claimed the agreement had been terminated under this provision or attempted to arrange for such a distribution. The trial court was in error in holding that plaintiff's incapacity or failure to contribute further to the enterprise ended his rights under the agreement.

The remaining question is one of fact: whether the parties terminated their joint venture relationship by mutual agreement. The evidence is in direct conflict. Defendant testified that when Rayson got out of the hospital in July of 1966 they had a conversation in which Rayson said that he was having money problems and would not be able to continue with their manufacturing deal, whereupon the parties agreed that thereafter the matter would rest on Rush's shoulders. Rayson denied any such agreement.

The trial court evidently believed Rush, and found that he had established this defense. Rush, of course, relies heavily on the rule that where the evidence is in conflict and the trial court observed the witnesses, the trial court's findings are entitled to great weight. See *Wakehouse v. Wetzel*, 250 Or 391, 443 P2d 227 (1968).

■ In this case, however, we find the trial court's findings to be outweighed by uncontradicted evidence which convinces us that there was no agreement in

1966 to terminate the joint adventure. Long after July of that year, when Rush asserts that the termination took place, he continued to act as though the original agreement was still in force. In March of 1967 he paid plaintiff a portion of the proceeds from the sale of manufacturing rights in the sweeping machine. This payment was, by Rush's own admission, calculated on the basis of 37 per cent of the amount he received, less a portion of the expenses. In August of 1968, four days after he had reached a final agreement with Northwest Pacific Corporation on the terms of the sale of the patent, Rush obtained Rayson's signature to an agreement to that sale "for my 37 per cent less my share of expenses to attorneys." The document which Rayson signed was prepared by Rush. In October, after receiving the first payment from Northwest Pacific, Rush sent plaintiff a check for $1,000.

Rush's explanations of these transactions as gifts are not convincing. All of his actions are consistent with a continuation of the joint venture relationship. We are convinced that the parties never agreed to terminate that relationship, and that plaintiff has established his right to share in the proceeds of the sale to Northwest Pacific Corporation according to the terms of the agreement of March 12, 1966.

The decree of the circuit court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.