Argued March 13, reversed and remanded April 25, 1974

# DEAN·VINCENT, INC., *Appellant, v.* RUSSELL'S REALTY, INC. ET AL, *Respondents.*

521 P2d 334

458

*Marvin S. W. Swire,* Portland, argued the cause for appellant. With him on the brief were Rosenberg, Swire & Riebe, Portland.

*William M. Holmes,* Bend, argued the cause for respondents Russell's Realty, Inc., and F. F. Spaulding. With him on the brief were Gray, Fancher, Holmes & Hurley, Bend, and B. D. Fancher.

TONGUE, J.

This is a suit for specific performance of an agreement between two real estate brokers to share equally a brokerage fee of $50,000 resulting from the sale of a large cattle ranch in Lake and Deschutes Counties.

Defendants' answer denies that there was a joint venture agreement and alleges that plaintiff failed to perform any work of value and was not entitled to any part of the brokerage fee.

The trial court found that there were "insufficient agreements" to constitute a joint venture, but implied an agreement to pay plaintiff for the reasonable value of its services, for which the court awarded $12,500. Plaintiff appeals.

Because we must review the record de novo, we shall summarize the facts.

*The facts.*

For some time prior to September 1971 defendants had a listing for the sale of the View Point Ranch. In September Robert T. McNulty, one of plaintiff's salesmen, contacted Sid M. Casteel, a salesman for defendant Russell's Realty, and said that he was looking for a large ranch to sell. Casteel told McNulty about this ranch and mailed information about it with a letter stating that:

"* * * If your people show any interest, bring them up, or send them along. I'll take care of them, and I might mention that we work on a 50/50 co-op basis, all things being equal."

On November 18, 1971, McNulty wrote to Casteel regarding their arrangement:

"* * * It is my understanding that if we provide a buyer that we would receive one half of the broker's fee."

In reply to McNulty's letter, Casteel wrote, on November 22, 1971, to McNulty:

"* * * be advised that so far as Russell's Realty is concerned, we co-op on an even basis and split. * * *"

Mr. McNulty then made efforts to find a purchaser for the ranch. Approximately 19 prospective purchasers were developed through his efforts, including Robert Baesler, an agent for a Dr. Weber, the eventual purchaser.

The arrangement between the parties was then confirmed by a further letter dated February 25, 1972, from Casteel's employer to plaintiff stating that:

"This is to confirm a verbal agreement made by Sid Casteel, and your Mr. Robert McNulty regarding a proposed sale of the View Point Ranches.

"Please be advised that we will be most happy to co-operate with your company and Mr. McNulty, in attempting to effect and negotiate a sale of the said View Point Ranches, and that we agree to a 50-50 split on any and all commissions to be derived from the above mentioned.

"Any sale arranged as per the above, shall bear the names of both Russell's Realty, Inc. and Dean Vincent Inc."

Before Dr. Weber came personally to Oregon to see the ranch Mr. King, one of his agents, came to Portland. McNulty met him at the airport and drove him to Bend to meet Casteel. The three men then went on to see the ranch, after which McNulty drove King back to the Portland airport.

On March 16, 1972, Dr. Weber, Mr. Baesler and Mr. King came to Portland where McNulty met them and flew with them to Klamath Falls, where they stayed over night to meet Casteel the next morning. McNulty rented a large "Travel-all" for the drive to look at the ranch.

The next morning Dr. Weber became "very agitated and annoyed," apparently because he wanted

to leave early and was not pleased with the "Travelall" to ride in for the long trip; because McNulty did not have the detailed information about the ranch which he desired and also because McNulty did not "pick up" the bill for a restaurant breakfast.

Dr. Weber and his party then rode with Casteel in his car, leaving McNulty to drive there alone. During the examination of the ranch the same thing occurred. As a result, Casteel showed the ranch to Dr. Weber and his party. During that visit Dr. Weber made an offer on the ranch and discussed with Casteel the terms of an earnest money agreement. Dr. Weber wanted his own attorney to prepare the agreement, but Casteel sent to him a proposed agreement in which, among other things, both Russell's Realty and Dean Vincent were named as the realtors. Casteel then reported to McNulty that Dr. Weber had made the offer.

Meanwhile, McNulty wrote to Casteel sending a map, as previously agreed, and stating, among other things, that "the sale is the important feature and our share of the fee will soon heal any bruised feelings."

After hearing nothing from Dr. Weber for several days, McNulty wrote to Casteel to suggest that he (McNulty) call Mr. King, one of Dr. Weber's agents. Casteel wrote back, saying that he was "dickering" with Dr. Weber's attorney "in an effort to put an offer together" and "I strongly suggest that you do not disturb Mr. King."

Two weeks later, Casteel wrote again to McNulty saying that Dr. Weber and his party had been his guests for four days and that "we have the deal in escrow" under terms which he then described, including

payment of $1,450,000 in cash. In that letter Casteel also said:

> "Bob, this is an extremely embarrassing position that I find myself in. In no way have I tried to 'steal' your clients or keep them away from you, however when they called me and asked that you NOT be present, I had no alternative other than take care of them * * *"
>
> "* * * * *
>
> "I sincerely hope that everything is going well for you, and I will keep you informed of our progress here."

McNulty then wrote to Casteel, asking that "a copy of the offer" be sent to Dean Vincent, which Casteel then did. In that letter McNulty also referred to the Klamath Falls incident and stated that:

> "It was fairly obvious that my presence embarrassed all three after this incident thus I made myself available if and when they wished something. * * *"

Some weeks later, on June 5, 1972, Casteel wrote a final letter to McNulty to report on the closing of the sale. He also stated that the "episode" had been "most embarrassing to me"; that he had "spent over forty days with the buyers" and that:

> "In so far as the commission split is concerned, I am well aware of our agreement and it is not for me to determine, but I do have this question: In all fairness do you believe that you deserve a 50/50 split?"

This lawsuit then followed. At the trial Mr. Casteel testified that:

> "It was understood, I thought, that we would each do an equal part of the work."

Mr. Casteel was asked on cross-examination about

his early letter to McNulty in which he said that "I know that you are not too familiar with this type of dealing," but that "I grew up on a cattle ranch" and that "if you have the buyers, together we will handle any situation up here." He replied that "it wasn't necessary that he [McNulty] know too much about a ranch," but that although he expected to prepare and present to the buyers the technical information about the ranch, he nevertheless expected McNulty to find a buyer, take care of his clients, furnish some transportation, come up to Bend, "participate in the selling," spend his time equally with Casteel, and share equally in the effort and expense.

He also testified that the custom among brokers in Central Oregon was that if one broker produced a buyer for another broker who had a listing on property for sale he would be paid 20 to 25 per cent of the commission for "simply furnishing the buyer" and that according to his understanding, in order for Dean Vincent to be entitled to 50 per cent of the commission it would have to both supply a buyer and also perform half the work.

Mr. Casteel agreed, however, that Mr. McNulty should not have "injected himself after they [Dr. Weber] expressed the desire to have nothing to do with him" and that this "would have killed the deal." Mr. Casteel's employer also testified that when a salesman knows that his participation in a transaction might jeopardize the sale on behalf of his principal it is "his duty to his principal to step out of the picture."

Mr. Casteel also conceded that McNulty continued to hold himself available to do everything that was called upon him to do to complete the transaction;

that McNulty never refused to do anything in further-
ance of the transaction, but that he didn't ask McNulty
"to do very much."

Plaintiff offered testimony in rebuttal to the
effect that according to the custom among real estate
brokers, an agreement to "cooperate" with another
broker who furnished a buyer on a "50-50 split" had
"nothing to do with a split of the work," but that under
such an agreement the broker who furnished the pur-
chaser would be paid 50 per cent of the commission
and that the term "all things being equal" in the first
letter by Mr. Casteel "doesn't mean anything as far
as work effort."

Mr. McNulty also testified to the time devoted
and expenses incurred by him in advertising this ranch,
in some 30 long distance telephone calls, in correspon-
dence, in two trips from Portland to the ranch, in
renting the "Travel-all" and buying a tire for it, and
in meals and lodging. He also testified to the under-
standing that each broker was to pay his own expenses.
As previously stated, he also "developed" some 19
prospective purchasers and sent their names to Mr.
Casteel.

1. *There was a joint venture to sell the ranch.*

Defendants contend that "there was no express
agreement between the parties concerning a commission
for a sale of the View Point Ranch and their relation-
ship was not a joint venture."

■■ We start with the rule that a joint adventure is
never presumed and that the burden of establishing it
is upon the party who alleges it. *Long v. S.I.A.C.,* 246
Or 187, 192, 424 P2d 236 (1967). It is the rule in Ore-

gon, however, that a contract of joint adventure need not be express, but may be implied in whole or in part from the conduct of the parties. *Suitter v. Thompson et ux,* 225 Or 614, 627, 358 P2d 267 (1961); *Lane v. National Ins. Agency,* 148 Or 589, 596, 37 P2d 365 (1934). Indeed, in *Salem-Fairfield Tel. Assn. v. McMahan,* 78 Or 477, 482, 153 P 788 (1915), this court said that although a joint venture is usually created by express or implied agreement, "equity will look through the entire transaction * * * in order to promote justice" and held that under the circumstances of that case a joint venture was created by operation of law.

■■ It has also been said that the usual rule of contract law to the effect that the terms of a contract must be definite and certain is enforced less vigorously in contracts of joint venture than in other types of contracts, particularly in cases in which the joint venture is not wholly executory, but has been wholly or partially executed. 2 Rowley on Partnerships (2d ed 1960) 468, § 52.3, and *Mason v. Rose,* 176 F2d 486 (2d Cir 1949). This result would appear to follow from the established rule that a joint venture for a single undertaking may be implied from the conduct of the parties. But see *Reed et al v. Montgomery,* 180 Or 196, 175 P2d 986 (1947).

■■ Thus, even though there has been no express agreement on the subject of dividing the profits of a joint venture, the law may imply an agreement for equal division of any profits. Indeed, when two parties enter into a joint venture the prima facie inference is that they are equally interested and entitled to an equal share of any profits, in the absence of evidence to the contrary. See *Guis v. Coffinberry,* 39 Or 414, 419, 65 P 358 (1901), and *Campell's Gas Burner Co. v. Hammer,*

78 Or 612, 618, 153 P 475 (1916). Cf. *Walls v. Gribble,* 168 Or 542, 124 P2d 713 (1942).

■ An agreement between real estate brokers to work together in an effort to sell property and to share the commission on the sale is commonly held to be a joint venture, despite some decisions to the contrary. See Annot., 171 ALR 1012, 1014 (1947). This has also been the rule adopted by this court. *Stark et al v. McKenna et al,* 124 Or 332, 348, 263 P 391 (1928).

■■ In this case the evidence clearly shows that Mr. McNulty and Mr. Casteel agreed to work together in an attempt to sell this ranch and to share equally any commissions resulting from such a sale. We hold that in doing so they were engaged in a joint venture and, as such, were in a fiduciary relationship with each other. *Walls v. Gribble, supra* at 546, and *McIver v. Norman,* 187 Or 516, 522, 205 P2d 137, 213 P2d 144 (1949). As real estate brokers they also were in a fiduciary relationship with the owner of the ranch. *Parker v. Faust,* 222 Or 526, 529-30, 353 P2d 550 (1960).

2. *The inability of Mr. McNulty to continue to contribute his personal efforts to consummate the sale did not terminate the joint venture.*

The trial court, in its written opinion, held that:

"It is evident to the court that the parties intended a 50-50 division of an earned commission for like cooperative effort but reached no agreement for the contingency of a disproportionate effort expended by each. It is clear that the effort in fact exercised by each was substantially disproportionate. Plaintiff's principal contribution to the sale from which the commission was realized was limited to providing a contact and arranging to meet with the contact at the ranch to view the

premises. Plaintiff's contributions ceased at this point and the critical efforts of negotiating and concluding the sale, encompassing some forty days, were entirely those of the defendant. It is of no moment why plaintiff ceased to participate in the thorny problem of bringing the seller and buyer into concert. The fact is, plaintiff did not contribute anything in the court's view, from this time forward.

"It may be that the parties initially contemplated entering into a joint venture for the sale of this ranch but the enterprise failed to reach fruition and there were insufficient agreements reached between them to establish their correlated responsibilities as joint venturers. * * *"

For the purpose of deciding this case we may assume that the trial court was correct in holding that the agreement of the parties was to the effect that each of them would contribute a "like cooperative effort," rather than a "disproportionate effort." In other words, we need not decide whether plaintiff was correct in its position that under an agreement between real estate brokers to "cooperate" in the sale of property the broker who provides the purchaser is entitled to 50 per cent of the commission regardless of whether the time and efforts expended by the two brokers are otherwise "disproportionate."

After the incident in Klamath Falls it became apparent that Dr. Weber wanted nothing further to do with Mr. McNulty and that for McNulty to interject himself into the further conferences and negotiations for the sale of the ranch to Dr. Weber, "would have killed the deal," as stated by Mr. Casteel.

At that point Mr. McNulty, who owed a fiduciary duty to the owner of the ranch, as well as a fiduciary duty to Mr. Casteel, as his joint venturer,

was obligated to discontinue his personal efforts to consummate the sale, at least insofar as such efforts involved any further personal contacts with Dr. Weber and his agents. See 2 Rowley, *supra,* 502, § 52.29.

In *Rayson v. Rush,* 258 Or 315, 329, 483 P2d 73 (1971), we said:

"In *McIver v. Norman,* 187 Or 516, 540-542, 205 P2d 137, 213 P2d 144, 13 ALR2d 749 (1949), we approved the rule that, absent exceptional circumstances, a joint adventurer who has contributed to the enterprise cannot be deprived of his share of the profits for a failure to perform all of his duties under the agreement of joint venture. * * *"

and (at 330):

"* * * The trial court was in error in holding that plaintiff's incapacity or failure to contribute further to the enterprise ended his rights under the agreement."

■■ We reach the same result in this case. And even if the conduct of Mr. McNulty might be regarded as such as to constitute a breach of the joint venture, so as to render plaintiff liable for any loss or damage resulting from such a breach, no claim of loss or damage has been made by the defendants in this case. See *United Brokers Co. v. Dose,* 143 Or 283, 287, 22 P2d 204 (1933), and 2 Rowley, *supra,* 501-02, § 52.28.

■ Neither was this a case in which it is claimed that there was either an abandonment of the joint venture or a mutual agreement to terminate it. Cf. *Rayson v. Rush, supra* at 330-31. See also 2 Rowley, *supra* at 512-13, § 52.38. On the contrary, all of the actions of Mr. Casteel, as well as those of Mr. McNulty, were consistent with a continuation of the joint venture relationship. Mr. Casteel continued to report by

correspondence to Mr. McNulty and submitted a proposed earnest money agreement to the purchaser with the names of both brokers. He also conceded that McNulty held himself available to do anything that he might be called upon to do to complete the transaction and that he did everything he was asked to do.

Having thus chosen to continue with the joint venture, rather than seek to terminate it for failure of performance by Mr. McNulty, defendants cannot now complain. Cf. *Carey v. Hays,* 248 Or 444, 449, 434 P2d 331 (1967).

Under these facts and circumstances, we hold that plaintiff was entitled to share equally in the $50,000 commission on the sale of this ranch. We therefore must remand this case for further proceedings not inconsistent with this opinion.

Reversed and remanded.