THORSON,
*Respondent,*

*v.*

BELLAMY et al,
*Appellants.*

(No. 15,646-L, CA 18703)

635 P2d 1048

J. Burdette Pratt, Nyssa, argued the cause for appellant. With him on the briefs was Stunz, Fonda & Pratt, Nyssa.

John N. Hutchens, Vale, argued the cause for respondent. With him on the brief was Schroeder & Hutchens, Vale.

Before Gillette, Presiding Judge, and Roberts and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

In this proceeding, plaintiff sought an accounting from defendant for profits allegedly derived by defendant from the parties' joint venture to sell a parcel of real estate. Defendant denied existence of the venture. The trial court, sitting without a jury, found that (1) a joint venture existed between the parties to sell the parcel, and (2) in the absence of satisfactory evidence of any other arrangement, the profits from the sale were to be shared equally. Defendant appeals. We affirm.

## FACTS

Plaintiff (Thorson) and defendant (Bellamy) are real estate agents. Thorson entered into a listing agreement with one Grafe to sell the parcel in question. The agreement gave Thorson a right to a commission if he arranged a sale. Because the listing was "open," however, Grafe was free to make similar agreements with other agents.

Thorson then invited Bellamy to help him sell the land. He agreed to give Bellamy one-half the commission if Bellamy arranged a sale; if Thorson made the sale, Bellamy was to receive nothing. While this first listing was in effect, Bellamy attempted to interest Harland Crawford in the land. Thorson assisted Bellamy in his dealings with Crawford, but they were not successful.

The first listing expired with the land unsold. Grafe then offered Bellamy an exclusive listing on the property. Bellamy accepted the listing, but insisted that Thorson's name be included in the agreement as real estate broker. Bellamy also included at the bottom of the listing agreement: "[T]his is a cooperative listing with Freeland Thorson of Weiser, Idaho." At the time they reached the agreement, Bellamy had told Grafe that he intended to act in a cooperative arrangement with Thorson and testified at trial that he had intended to work with Thorson on the sale and to share the commission with him. Bellamy later telephoned Thorson and told him that he was included in the deal. Thorson was suprised, but did not object.[1]

---

[1] Under an exclusive listing, the listing agent has the sole authorization to sell the land and receive a commission.

The evidence conflicts as to Bellamy's reasons for including Thorson. Bellamy claims that he included Thorson because he thought that the earlier listing, which Thorson shared with him, was an exclusive one. Grafe testified, however, that when Bellamy placed Thorson's name on the second listing, Grafe told Bellamy that the first listing had been open.

Concerning the commission for a sale, Bellamy testified that he intended Thorson to receive a share of the commission even if Thorson did not make the sale. This is fundamentally different from the first arrangement, where Bellamy was to receive a share only if he actually made the sale. The evidence conflicts, however, as to how the commission was to be divided under the second agreement.

Bellamy discussed the split in a letter to Thorson dated July 7, 1977. He suggested an arrangement in which the selling agent would receive 85 percent and the non-selling agent would receive 15 percent. He concluded, "* * * I would prefer a definite percentage. Maybe 80-20 would work also. What is your preference? * * *"

The parties discussed the commission again in an August 3, 1977, telephone call. Thorson, relying at least partially on a memo he prepared following the call, testified at trial that the two men agreed on a 50-50 split of the commission. If a third broker became involved, he testified, the split was to be one-third each. His memo, in his own handwriting, said:

> "Called Tiny at 963-8444 August 3rd, 1977. Discussed 50-50 split on total receipts. If another realtor comes into the picture it would be one-third, one-third and one-third."

Bellamy testified that Thorson suggested such a 50-50 split but that he refused to agree to it.

Bellamy again wrote to Thorson on August 29, 1977, about dividing the commission. He stated that 50-50 was not a fair division and once again suggested an 80-20 split. Thorson did not answer, because he was hospitalized August 27, 1977, and remained away from work until around December 15.

Bellamy also wrote a letter to Grafe on August 29, 1977, stating that he had offered Thorson a commission

split of 80-20. Bellamy and Thorson spoke about the split again on December 15, 1977. By that time, the property had been sold. According to Thorson, Bellamy then told him that the sale had generated no commission but, had there been a commission, the split would have been 50-50.

Bellamy actively sought a buyer for the Grafe property during the second listing; Thorson did not. Thorson's participation in the sale of the property consisted solely of visits to the home of Mrs. Madsen whose signature was later needed for certain papers to clear title. However, Bellamy did not complain to Thorson about Thorson's inactivity; neither did he seek to terminate the agreement.

Bellamy eventually purchased the land himself from Grafe and immediately resold it to Harland Crawford. Thorson's sole participation in the sale of the property came in connection with arrangements for financing the transaction. Grafe, the seller, was purchasing the property on contract from the Madsens. In order for Crawford, the ultimate buyer, to obtain a loan, it was necessary for Grafe to obtain from Mrs. Madsen a release and deed to a parcel of the property sold. The release was essential to the subsequent purchase and re-sale of the land. Bellamy and Grafe spoke with Mrs. Madsen (Mr. Madsen was deceased) about executing the release. Mrs. Madsen initially was unable to decide whether to sign it. She referred the two men to her brother-in-law, Al Madsen of Yakima, Washington. Mrs. Madsen stated that, if her brother-in-law approved the release, she would sign it.

On December 6, 1977, Bellamy and Grafe drove to Yakima and spoke with Al Madsen. Madsen approved the transaction and said that he would convey his approval to his sister-in-law. Al Madsen did write a letter to Mrs. Madsen, stating that he approved the release. Grafe testified that obtaining Al Madsen's approval was the important factor in getting Mrs. Madsen's assent.

Grafe later took the release forms to Mrs. Madsen's home to be signed. Mrs. Madsen was 85 years old, had trouble walking, and, according to Grafe, "her mind was a little slow." Grafe asked Thorson to accompany him to Mrs. Madsen's home because Grafe knew that Thorson and Mrs. Madsen were long-time acquaintances and that Thorson's

presence would be "a help." Thorson had known Mrs. Madsen for about twenty years and had once attempted to help her sell a home.

Grafe and Thorson first visited Mrs. Madsen on January 26, 1978. Thorson read the release documents to her and explained their effect. Thorsen also assured her that signing the documents would not be against her interests. She then signed the release, and Thorson notarized her signature.

Because of an error in the release, Thorson and Grafe returned to Mrs. Madsen's home on April 15, 1978. At that time, Thorson explained the earlier mistake to her and again assured her that by signing the release, she was not harming herself. He again notarized her signature. Thorson testified that Mrs. Madsen relied upon his statements in executing the release. Mrs. Madsen lived within one mile of Thorson's office, and Grafe estimated that the two visits took a total of two hours each.

As noted, Bellamy told Thorson that there was no commission on the sale. However, Grafe had reduced the sale price to Bellamy in the exact amount of the agreed commission. Bellamy then resold the land to Crawford in a rather complicated deal, but the net result was that Bellamy's profit was almost exactly the same as his expected commission. The trial court recognized this in its findings and stated: "No matter how the transaction is viewed the true nature of the gain relates back to the commission for sale of the Clyde Grafe Ranch."

When Bellamy refused to acknowledge the commission and to give Thorson his share, Thorson brought this proceeding. The trial court held: a joint venture existed during the second listing; Bellamy received a commission on the sale of the Grafe property; there was no evidence that Thorson and Bellamy reached an agreement about how to split the commission; and, in the absence of such an agreement, the two men should split the commission and expenses 50-50.

## JOINT VENTURE

### 1. Existence of an Agreement

■■ The existence of a joint venture is never presumed, and the burden to prove it is on the party who alleges it.

*Dean Vincent, Inc. v. Russell's Realty,* 268 Or 456, 466, 521 P2d 334, 71 ALR3d 576 (1974). While a joint venture is not strictly a partnership, the rules and principles applicable to partnership govern the rights, duties and obligations of the parties. *Preston v. State Industrial Acc. Comm.,* 174 Or 553, 149 P2d 957 (1944); *Stone-Fox Inc. v. Vandehey Development Co.,* 290 Or 779, 787, 626 P2d 1365 (1981).

■ A contract of joint venture need not be express, but may be implied in whole or in part by the parties' conduct. *Dean Vincent, Inc. v. Russell's Realty, supra,* 268 Or at 465; *Suitter v. Thompson, et ux,* 225 Or 614, 627, 358 P2d 267 (1961). Consequently, the usual requirement that the terms of a contract must be definite and certain is enforced less rigorously in contracts of joint venture than in other types of contracts, especially if the object of the joint venture has been wholly or partially executed. *Dean Vincent, Inc. v. Russell's Realty, supra,* 268 Or at 465. Even in the absence of an express or implied agreement, "equity will look through the entire transaction * * * in order to promote justice." *Salem-Fairfield Tel. Assn. v. McMahan,* 78 Or 477, 482, 153 P2d 788 (1915), *quoted in Dean Vincent, Inc. v. Russell's Realty, supra,* 268 Or at 465.

In Oregon, as in several other states, an agreement between real estate brokers to work cooperatively to sell property and to share the sale commission is generally held to be a joint venture. *Dean Vincent, Inc. v. Russell's Realty, supra,* 268 Or at 466; *Stark et al v. McKenna et al,* 124 Or 332, 348, 263 P 391 (1928).

■ A joint venture arose in this case from the conduct of Bellamy and Thorson. Bellamy expressed in the listing agreement and in conversations with Grafe and Thorson his intent to enter a cooperative agreement with Thorson. He included Thorson's name with his own as real estate broker on the listing agreement with Grafe and included an unambiguous statement indicating that he and Thorson had a cooperative listing. Bellamy also expressed his intent to associate with Thorson in a conversation with Grafe leading up to the listing agreement. Later, he told Thorson of the arrangement. Finally, he acknowledged at trial that he intended, at the time he signed the agreement, to work with Thorson on the sale and to share the commission with him.

The several communications between Thorson and Bellamy from June to December, 1977, provide the most persuasive evidence of a joint venture. In the telephone conversations and letters, both parties assumed that an agreement existed; only how to divide their commission was at issue.

■ Bellamy argues that because he included Thorson in the listing gratuitously, the agreement was not supported by consideration. True, Bellamy was under no obligation to include Thorson in the listing. He had an exclusive right to sell the property for a commission, and Thorson had no claim to any share in the commission until Bellamy granted him that right. Though Thorson paid no money to become involved in the exclusive listing, there was consideration to support the agreement. The general rule is stated in 46 Am Jur 2d 30:

> "The consideration for a contract of joint venture may be a promise, express or implied, to contribute capital or labor to the enterprise."

In entering the agreement, Thorson impliedly promised to make a good faith effort to sell the property. That was sufficient consideration to support the joint venture.[2]

## 2. Inadequate Performance as Defeating a Joint Venture

■ Bellamy next argues that, even if a joint venture existed at one time, Thorson's performance was inadequate. Even if Thorson performed inadequately under the terms of the contract, he could not be deprived of his share of the profits. In *Rayson v. Rush,* 258 Or 315, 329, 483 P2d 73 (1971), the court stated the rule that, "* * * absent exceptional circumstances, a joint adventurer who has contributed to the enterprise cannot be deprived of his share of the profits for a failure to perform all of his duties under the agreement of joint venture." *Accord, Dean Vincent, Inc. v. Russell's Realty, supra,* 268 Or at 468.

■ Bellamy claims that Thorson's performance was so inadequate that it constituted "exceptional

---

[2] Bellamy does not argue that Thorson was in any way ineligible to enter into such an agreement. *See* ORS 696.290.

circumstances" barring him from his share of the profits. Thorson's inactivity, however, was not exceptional. He assisted in obtaining the Madsen release upon which the ultimate sale depended. Even if Thorson's inactivity were held to be exceptional, however, Bellamy did not complain to Thorson when he became dissatisfied with Thorson's performance, and he did not terminate the joint venture. A joint venturer cannot complain about the inadequate performance of a fellow joint venturer when he has chosen to continue in the relationship, rather than to terminate it. *Dean Vincent, Inc. v. Russell's Realty, supra,* 268 Or at 469.

### 3. Division of the Commission

■ ■ In the absence of an express agreement to divide profits from a joint venture, the law may imply an agreement for equal division. The rule in Oregon is that, when two parties undertake a joint venture, there is a *prima facie* inference that they are entitled to an equal share of profits in the absence of evidence to the contrary. *Dean Vincent, Inc. v. Russell's Realty, supra,* 268 Or at 465. Because the contradictory evidence of the existence and terms of an agreement for splitting the commission was inconclusive, the trial court relied on the *prima facie* inference of an even split. It found:

> "There is an absence of evidence of any agreed division between the parties. The court is thus left with the *prima facie* inference that when two parties enter into a joint venture, they are equally interested in and entitled to an equal share of any profits arising therefrom."

■ In light of its finding that the parties did not expressly agree how the commission was to be shared, the court properly relied on the inference. Bellamy relies on the fact that the inference is said to arise only "* * * in the absence of evidence to the contrary." *See Dean Vincent, Inc. v. Russell's Realty, supra,* 268 Or at 465. He insists that the court should not invoke the *prima facie* inference "* * * where parties discuss and expressly reject an equal division of the profits."

■ There is undisputed evidence that the parties discussed a 50-50 split, but a dispute as to whether they agreed on it. Thorson claimed they did agree; Bellamy claimed they did not. Bellamy does not suggest how the

trial court might have determined the split without reference to the inference; he simply points out that the inference is contrary to his version of the evidence. In cases like this, where evidence is contradictory and an agreement as to how the profits should be split cannot be affirmatively found, we hold that the trial court may rely upon the *prima facie* inference unless that inference is rebutted by the contesting party.

Our review in this case is *de novo.* On examining the evidence, we are free to determine what the terms of the agreement were; however, "* * * the findings of the trial judge are entitled to substantial weight, particularly where the facts are in dispute and the credibility of the witnesses is an important factor." *Wilkinson v. Carpenter,* 276 Or 311, 314, 554 P2d 512 (1976); *Adamson v. Adamson,* 273 Or 382, 541 P2d 460 (1975). Our review of the evidence has produced no basis for disagreeing with the trial judge that the *prima facie* inference was not rebutted by Bellamy.

We conclude that there was a joint venture between Bellamy and Thorson during the second listing, that the trial court properly determined that a 50-50 split of the profits was appropriate, and that Thorson could not be deprived of his share of the profits because his inactivity was not such as to constitute abandonment of the venture. The facts surrounding the Madsen release show that Thorson did play a significant part in making the final sale possible.

The judgment of the trial court is affirmed.