[No. 11519-4-III.    Division Three.    November 2, 1993.]

STEVEN K. ADAMS, *Respondent*, v. GERALD P. JOHNSTON, ET AL, *Defendants*, DEACONESS MEDICAL CENTER, *Petitioner.*

NIKOLAS M. ADAMS, ET AL, *Respondents*, v. GERALD P. JOHNSTON, ET AL, *Defendants*, DEACONESS MEDICAL CENTER, *Petitioner.*

*Conni L. Stamper, Steven R. Stocker, Scott R. Smith,* and *Stamper, Sherman, Stocker & Smith, P.S.,* for petitioner.

*Marcia M. Meade* and *Dawson & Meade, P.S.; Carl A. Taylor Lopez, Stephen Layne Nordstrom,* and *Ford, Nees & Nordstrom,* for respondents.

THOMPSON, C.J. — Deaconess Medical Center seeks discretionary review of the trial court's determination that two tort settlements were reasonable under RCW 4.22.060(1), and the subsequent denial of its motion for summary judgment dismissing the vicarious liability claims brought by the settling plaintiffs. We affirm the trial court's determination of the reasonableness of both settlements, reverse the denial of summary judgment, and remand for entry of partial summary judgment on the issue of vicarious liability.

BACKGROUND

This matter arises out of the treatment of Steven K. Adams at an alcohol treatment facility (CAREUNIT) at Deaconess Medical Center (Deaconess). The CAREUNIT was established in 1982 when Comprehensive Care Corporation (CompCare) contracted with Deaconess to provide management and other services for the CAREUNIT.[1] One of CompCare's contractual obligations was to hire a medical director. CompCare hired Gerald Johnston, M.D.

On May 17, 1985, Steven was brought to the CAREUNIT by his father, Darwin B. Adams. Both were interviewed by Dr. Johnston. When Steven refused to be voluntarily detained, Dr. Johnston called in mental health professional Arlene Logan. Ms. Logan determined Steven should be involuntarily detained at the Acute Care Unit at Sacred Heart Medical Center. He was taken into emergency custody for evaluation and treatment at Sacred Heart because of his potential suicidal state.

On May 20, Dr. Johnston transferred Steven from Sacred Heart to the CAREUNIT at Deaconess and admitted him as a voluntary patient. Dr. Johnston's services as medical director of the CAREUNIT were terminated on May 22. On May 25, Steven left the CAREUNIT and returned home before his treatment was complete.

Two and one-half months after leaving the CAREUNIT, Steven shot his father in the head. Darwin B. Adams suffered a traumatic brain injury as a result of the shooting. His injuries were permanent and severely debilitating. Steven was subsequently found not guilty by reason of insanity of the criminal charge brought against him.

In separate lawsuits, Darwin B. Adams, his children, and Steven Adams sued Dr. Johnston, CompCare, Deaconess and Sacred Heart. The lawsuits were consolidated and Sacred Heart was dismissed.

Immediately prior to trial, Steven Adams settled his claims against CompCare for $20,000 and his claims against Dr. John-

---

[1]"CAREUNIT" and "CompCare" are the registered service marks of Comprehensive Care Corporation.

ston for $35,000. The remaining Adams family members settled their claims against CompCare for $150,000 and against Dr. Johnston for $100,000. Deaconess opposed both settlements. It urged the court to assign $1 million as a reasonable settlement amount for Steven Adams and $2 million as a reasonable settlement amount for the remaining Adams family.[2]

After a reasonableness hearing, the trial court approved both settlements. A motion for reconsideration brought by Deaconess was denied. Deaconess thereupon moved for partial summary judgment, contending the Adams family's claims that Deaconess was vicariously liable for the acts of the settling defendants should be dismissed. The trial court denied that motion as well.

Deaconess petitioned for discretionary review of both the reasonableness order and the denial of its summary judgment motion. We accepted review of both.

## REASONABLENESS OF SETTLEMENT

1. Contentions. Deaconess contends the findings entered after the reasonableness hearing were not supported by substantial evidence and do not support the conclusion that the settlements were reasonable under RCW 4.22.060(1). According to Deaconess, the trial court did not apply the criteria established in *Glover v. Tacoma Gen. Hosp.*, 98 Wn.2d 708, 658 P.2d 1230 (1983), particularly as to the likelihood that full compensation could have been obtained from the settling defendants and by not comparing the size of the settlements with the potential verdict.

Both Darwin B. Adams and Steven Adams contend the findings were supported by substantial evidence and the trial court did not abuse its discretion in determining the reasonableness of the settlements. According to the Adamses, all *Glover* factors were considered and the court was simply fol-

---

[2] As explained herein, a settlement amount found reasonable under RCW 4.22.040 serves as an offset against any judgment obtained against a nonsettling defendant. Further, the nonsettling defendants' potential contribution rights from the settling defendants are extinguished. *Kirk v. Moe*, 114 Wn.2d 550, 556, 789 P.2d 84 (1990).

lowing *Pickett v. Stephens-Nelsen, Inc.*, 43 Wn. App. 326, 717 P.2d 277 (1986). They argue that the size of a settlement compared to the amount of a potential judgment is only one factor a court must consider and because the court balanced all factors, there was no error. *Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 795 P.2d 1143 (1990).

2. Tort Reform Act. Under the 1981 tort reform act, a hearing must be held as to the reasonableness of any settlement agreement between the parties.[3] A reasonableness finding is of extreme significance to a nonsettling defendant since one of its effects is to determine the amount of offset a nonsettling defendant will be entitled to against any subsequent judgment entered against it. Further, if reasonable, a settlement extinguishes each party's potential contribution rights under RCW 4.22.040 as a matter of law. *Kirk v. Moe*, 114 Wn.2d 550, 556, 789 P.2d 84 (1990).

One of the primary purposes of the reasonableness hearing is to protect the nonsettling defendant from paying more than his or her share of damages.

> There is a legitimate concern that claimants will enter into "sweetheart" releases with certain favored parties. To address this problem, the section requires that the amount paid for the release must be reasonable at the time the release was entered into.

Senate Journal, 47th Legislature (1981), at 636-37 (Senate Select Comm. on Tort & Prod. Liab. Reform, *Final Report 1981*, commenting on RCW 4.22.060). *See also Schmidt*, at 157.

The Legislature did not establish any standards for determining whether a settlement is reasonable, leaving such stan-

---

[3]Laws of 1981, ch. 27 (codified at RCW 4.22). RCW 4.22.060(1) provides in relevant part: "A hearing shall be held on the issue of the reasonableness of the amount to be paid with all parties afforded an opportunity to present evidence. A determination by the court that the amount to be paid is reasonable must be secured. If an agreement was entered into prior to the filing of the action, a hearing on the issue of the reasonableness of the amount paid at the time it was entered into may be held at any time prior to final judgment upon motion of a party.

"The burden of proof regarding the reasonableness of the settlement offer shall be on the party requesting the settlement."

dards for development by the courts. However, by amendment to the act in 1987, the party requesting the settlement bears the burden of proof regarding reasonableness. RCW 4.22-.060(1). Here, that burden fell on the Adams family.

■■ 3. Judicial Reasonableness Factors. As set forth in *Glover*, at 717, the court should consider the following factors in determining whether a settlement agreement is reasonable:

> [T]he releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released.[4]

No single factor controls the determination of reasonableness, the court having the discretion to weigh each case individually. *Glover*, at 718; *Schmidt*, at 158. All *Glover* factors require factual determinations that must precede the balancing and legal determination of reasonableness.

4. Standard of Review. Although the tort reform act does not require the trial court to enter findings and conclusions, the factors relied on by the court in determining reasonableness must be enunciated. *Glover*, at 718. Factual determinations will not be disturbed on appeal if supported by substantial evidence. *Schmidt*, at 158.

In addition to determining whether the findings are supported by the evidence, the appellate court determines whether the trial judge used discretion in balancing the factors and deciding reasonableness as a matter of law.

5. The Findings. The trial court entered written findings as to the following factors: (1) the merits of the plaintiffs' claims; (2) the merits of the settling defendant's defense theory; (3) the settling defendant's ability to pay; (4) the risk and expense of continued litigation; (5) the extent of the plaintiffs' investigation and preparation of the case; (6) the

---

[4]It is interesting to note, however, that *Glover* was decided without assessing all nine factors.

extent of plaintiffs' damages; and (7) the settling defendant's ability to pay.

Briefly summarized, the court found plaintiffs' risk of proceeding to trial was great; a defense verdict was possible; there was a substantial likelihood that a jury would assign substantial comparative negligence to Darwin Adams; the expenses of litigation were great; plaintiffs had thoroughly investigated their claims; plaintiffs' damages were "large" and "huge"; and, though inconsistent with its original oral finding, there was no competent proof that the settling defendants had sufficient assets to pay the potential judgment. In its oral decision, the court found no bad faith, collusion or fraud by the settling defendants.

6. The Evidence. The record before the trial court reflects substantial evidence supporting all findings, with one exception — the ability of the settling defendants to pay a potential judgment.

A declaration of insurance showed that Dr. Johnston had policy limits of $1 million per claim and $3 million in the aggregate. A letter from his insurer, dated September 5, 1986, acknowledged receipt of the lawsuits and noted Dr. Johnston's Psychiatrist and Neurologists Professional Liability policy limits. In that letter, the insurer accepted the defense with a reservation of rights "to disclaim coverage . . . in the event that factual evidence developed through discovery or investigation gives us such cause."

Dr. Johnston died before the reasonableness hearing. The trial court acknowledged the bankruptcy of Dr. Johnston and his death, but stated it did not know what assets, if any, his estate had above the insurance policy.

At the hearing on reconsideration of reasonableness, Dr. Johnston's attorney explained that an affidavit forwarded to the insurance company had been lost, but since the September 5, 1986, reservation of rights letter, "no effort was made to deny or claim coverage for the malpractice coverage . . . [and] . . . [i]n fact we have paid, as the Court knows, in settlement in this case out of that policy". In response to the court's question to Dr. Johnston's counsel as to whether there was any quarrel

that there were two alleged events, he replied there were two claims, one by Steven Adams and the other by Darwin Adams.

As to CompCare, the affidavit of corporate counsel and an attached corporate balance sheet showed that as of November 30, 1990, CompCare had working capital of approximately $28 million and assets exceeded long term debt in excess of $29 million. These documents showed that through a wholly owned subsidiary, CompCare had assets within the state of Washington of an unspecified value. CompCare also answered an interrogatory regarding insurance by stating it had primary insurance coverage provided by Farmers Insurance, with secondary coverage provided by certain Lloyds Underwriters and third level coverage provided by National Union Fire Insurance Company of Pittsburgh. A total of $10 million was available per occurrence.

The trial court's written finding that the settling defendants lacked sufficient assets to support a potential judgment was not supported by substantial evidence. Its oral finding was. However, as the Adams family contends, a determination of reasonableness is a matter of balance for which there is no one overriding factor. *Glover*, at 718; *Schmidt*, at 158. The trial court properly applied the considerations articulated in *Glover* and the record supports its conclusion that the settlements were reasonable. The "huge" size of the potential judgment and the ability of the settling defendants to pay was offset by the slight probability of recovering, the expenses of litigation and the lack of bad faith, collusion, or fraud by the settling defendants.

### VICARIOUS LIABILITY

The Adams family alleged that Deaconess breached an independent duty owed to Steven Adams and was also vicariously liable for the acts of Dr. Johnston and CompCare. The motion for summary judgment brought by Deaconess was limited to dismissal of the vicarious liability claims.

1. Contentions. Deaconess contends that if the settlement agreements are approved as reasonable, the Adams family's vicarious liability claims should be dismissed under *Glover*

because the settling defendants were solvent. According to Deaconess, no facts show a joint venture relationship between or among the settling defendants, and even if a principal-agent relationship existed, Deaconess was a disclosed principal which has no vicarious liability for released solvent agents. For purpose of appeal, they ask the court to assume a principal-agent relationship between and among defendants.

The Adams family contends there was a joint venture arrangement between Dr. Johnston, CompCare and Deaconess and each is jointly and severally liable for the acts of the other. Although they produced no written joint venture agreement or affidavits containing facts supporting the existence of a joint venture, they contend one could be inferred or implied from the contracts between CompCare and Deaconess and between Dr. Johnston and CompCare. They cite *In re Estate of Thornton*, 81 Wn.2d 72, 79, 499 P.2d 864 (1972), *Nuttall v. Dowell*, 31 Wn. App. 98, 639 P.2d 832, *review denied*, 97 Wn.2d 1015 (1982), and *Refrigeration Eng'g Co. v. McKay*, 4 Wn. App. 963, 973, 486 P.2d 304 (1971). They also contend it could be inferred from the evidence that Deaconess was an undisclosed principal and settlement with an agent does not extinguish vicarious liability claims against an undisclosed principal so long as there is no double recovery.

■ 2. Standard of Review. The standard of review on appeal of a summary judgment order is de novo. The reviewing court conducts the same inquiry as the trial court. *Margoles v. Hubbart*, 111 Wn.2d 195, 760 P.2d 324 (1988). Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. CR 56. A material fact is one upon which the outcome of the litigation depends in whole or in part. CR 56(c); *Ragland v. Lawless*, 61 Wn. App. 830, 812 P.2d 872, *review denied*, 117 Wn.2d 1027 (1991).

■ 3. Settlement With a Solvent Agent. Since the 1981 tort reform act, a settlement and release of one of several joint tortfeasors does not release other joint tortfeasors by

operation of law.[5] RCW 4.22.060. However, such nonrelease has no application to an employer-employee and principal-agent relationship where liability is solely derivative or vicarious. As stated in *Glover*, at pages 722-23:

> Once the plaintiff agrees to settle with a solvent agent for a reasonable amount ... no principle of full compensation requires that she also be able to pursue a claim against the principal, since, presumably, she could have obtained full compensation from the agent. This situation is unlike that created by joint tortfeasor claims. When settling with one of a number of joint tortfeasors, the plaintiff may evaluate the relative conduct of each and determine that her best interests are served by a partial settlement. In such an instance, she might settle for less than the full amount of her damages. Various factors, such as the percentage of such joint tortfeasor's fault compared to the conduct of the nonsettling defendant, may influence this decision. In vicarious liability cases, on the other hand, the claim is based on the conduct of one individual and the liability is imposed as a matter of public policy to ensure that the plaintiff has the maximum opportunity to be fully compensated.

*Glover* concluded that the very foundation of a principal's secondary liability would be undermined if a primarily liable agent, capable of making the plaintiff whole, were released and the principal pursued for any remaining damages. *Vanderpool v. Grange Ins. Ass'n*, 110 Wn.2d 483, 487, 756 P.2d 111 (1988) reconfirmed *Glover*, stating such result is necessary under the tort reform act because a release between a plaintiff and an agent forecloses any possibility of the principal receiving contribution from his agent.

We turn, then, to the pertinent question of whether, as a matter of undisputed fact, if the settling defendants were agents, were they solvent?

A. *CompCare*. The evidence, previously summarized, reflects insurance as to CompCare in the amount of $10 mil-

---

[5]Joint tortfeasors are those persons acting independently whose conduct concurred and caused an indivisible injury. *Seattle-First Nat'l Bank v. Shoreline Concrete Co.*, 91 Wn.2d 230, 235, 588 P.2d 1308 (1978). The 1986 tort reform act provides that liability shall be several *and joint* "where both were acting in concert or when a person was acting as an agent or servant of the party." RCW 4.22-.070(1)(a).

lion per occurrence. There was no evidence introduced to raise a genuine issue as to the amount or fact of coverage. Even if Steven Adams' argument as to what constitutes an occurrence under the policy is considered for the first time on appeal, there was at least one occurrence and hence at least $10 million in coverage. In addition, the balance sheet provided by CompCare and the affidavit accompanying it reflected considerable assets over and above such insurance coverage. Unlike *Pickett,* significant assets were located in the state of Washington and there was insurance coverage. CompCare was solvent. Under *Glover* and *Vanderpool,* if CompCare was an agent of Deaconess, its settlement with the Adams family released Deaconess from any vicarious liability for its acts as a matter of law.

B. *Dr. Johnston.* As to the solvency of Dr. Johnston, the evidence before the trial court reflected $1 million per claim coverage for Dr. Johnston and the insurer's agreement to defend the doctor on a reservation of rights basis. There was no evidence presented to indicate that during the 4½ years that the lawsuit was pending, the insurer questioned coverage. Although not conclusive, the insurer agreed to pay the settlement amount on Dr. Johnston's behalf. The reservation of rights letter under these circumstances was insufficient to create a disputed issue of material fact as to coverage. Although it was undisputed that Dr. Johnston filed bankruptcy and died before the settlement was entered into, Dr. Johnston's estate was "solvent" to the extent of $1 million per claim.

4. Undisclosed Principal. There are no facts in the record to support the Adamses' contention that Deaconess was an "undisclosed" principal. The averments of counsel for Steven Adams that CompCare was not disclosed by Deaconess is not a fact material to this issue.

5. Joint Venture. The Adams family contends there was an issue of material fact as to whether Dr. Johnston, Comp-Care and Deaconess were joint venturers. We find no disputed facts.

Joint venture members are vicariously liable for each other's acts, such liability being founded on the voluntary

relationship that has arisen between the parties. 48A C.J.S. *Joint Ventures* § 63 (1981). It is unclear whether the release of one solvent joint venturer releases the other joint venturer. The *Glover* reasoning in the context of a principal-agent relationship is not persuasive in the context of a joint venture relationship. However, based on undisputed material facts, a joint venture relationship did not exist in this case as a matter of law.

■■ Joint ventures are not created by operation of law. They arise by express or implied contract. *Paulson v. County of Pierce*, 99 Wn.2d 645, 654, 664 P.2d 1202 (1983) (an express or implied contract is an essential element of a joint venture); *Institutional Mgt. Corp. v. Translation Sys., Inc.*, 456 F. Supp. 661, 665 (D. Md. 1978); *Dean Vincent, Inc. v. Russell's Realty, Inc.*, 268 Or. 456, 521 P.2d 334, 71 A.L.R.3d 576 (1974); *Legum Furniture Corp. v. Levine*, 217 Va. 782, 232 S.E.2d 782 (1977). In addition, a joint venture does not arise unless there is (a) a common purpose and intention to act as joint venturers; (b) a community of interest; and (c) an equal right to a voice accompanied by an equal right of control. *Rosenstrom v. North Bend Stage Line*, 154 Wash. 57, 60-61, 280 P. 932 (1929); *State ex rel. Ratliffe v. Superior Court*, 108 Wash. 443, 184 P. 348 (1919). Other indicia of a joint venture include the right to share in profits, a duty to share in losses, and a joint proprietary interest in the subject matter. *See generally* 48A C.J.S. *Joint Ventures* § 10 (1981).

Pursuant to the contract between CompCare and Deaconess, CompCare was required to provide ongoing program management and support services. In addition, CompCare was to employ the CAREUNIT program coordinator, the medical director, the clinical psychologist, an occupational/recreational therapist, an alcoholism therapist, a social worker and counselors. The contract gave CompCare complete responsibility for compensating such personnel, for providing professional and public liability insurance for them, and the contract specifically stated that such personnel would be employees or independent agents of CompCare, not employees of Deaconess.

Deaconess was contractually prohibited from soliciting or hiring CompCare's employees or independent contractors during their employment and 1 year thereafter. There was no profit sharing under the agreement. CompCare was paid a monthly management fee plus a fee for professional and administrative service at the rate of $75.50 per program patient day, per month with provision for adjustment. Although the Adamses contend such arrangement is profit sharing, their contention lacks merit. Additional patient days would require CompCare to perform additional services. This provision is not in the nature of an interest in the benefits of a business in which CompCare is a co-owner. Further, there was no joint ownership of property and no agreement to share in losses. Although the Adamses contend a 3 percent bad debt adjustment amounts to an agreement to share losses, the argument is not well taken. Such adjustment is not an equal sharing of potential losses characteristic of a joint venture.

CompCare, not Deaconess, entered into contracts with Dr. Johnston. Although Steven Adams contends there was a contract between and among Deaconess, CompCare and Dr. Johnston, there is no evidence to support this contention.

■ The contracts between CompCare and Dr. Johnston outlined Dr. Johnston's contractual duties as medical director of the CAREUNIT. It stated that Dr. Johnston was to act as an independent contractor. Although Dr. Johnston was required to be a member of the Deaconess medical staff, staff privileges alone do not make a hospital vicariously liable for a physician's acts. *See Burnet v. Spokane Ambulance*, 54 Wn. App. 162, 772 P.2d 1027, *review denied*, 113 Wn.2d 1005 (1989). There was no evidence that Dr. Johnston contributed any capital to CompCare or the CAREUNIT. While Dr. Johnston was compensated, in part, based on the number of patients admitted to the unit, he did not share in the net profits of CompCare or Deaconess or the CAREUNIT, nor did he agree to accept any losses. The relationships of employer-employee and employer-independent contractor are not compatible with the equal sharing required between joint ven-

turers. Logically, such relationships do not exist together between the same parties in relation to the same transaction. *Institutional Mgt. Corp.*, at 666.

There were no disputed material facts as to whether there was a joint venture relationship either between CompCare and Deaconess or between CompCare, Deaconess and Dr. Johnston. Based on those undisputed material facts, no joint venture relationship arose by operation of law.

We affirm the trial court's determination of the reasonableness of both settlements, reverse the denial of summary judgment, and remand for entry of partial summary judgment on the issue of vicarious liability.

MUNSON, J., and SPERLINE, J. Pro Tem., concur.

After modification, further reconsideration denied March 8, 1994.

Review denied at 124 Wn.2d 1020 (1994).