IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| MANUEL HIDALGO, f/k/a MANUEL HIDALGO RODRIGUEZ, individually, | ) ) ) | |
| Appellant, | ) ) | No. 30544-9-III |
| v. | ) ) | |
| JEFFREY BARKER, individually, BARKER AND HOWARD, PS, INC. a Washington corporation, and EDWARD STEVENSEN, | ) ) ) ) ) | |
| Defendants, | ) ) | |
| WESTPORT INSURANCE CORPORATION, | ) ) ) | PUBLISHED OPINION |
| Respondent and Cross Appellant. | ) ) ) | |

SIDDOWAY, A.C.J. — Manuel Hidalgo was convicted of being a participant in the much-publicized "Wenatchee sex ring" and served over four years in prison before his judgment and sentence was reversed on the basis of the newly discovered evidence that discredited the "sex ring" investigation and resulting charges.[1] Mr. Hidalgo then brought

---

[1] The allegations of improper and coercive investigation techniques are recounted in *Rodriguez v. Perez*, 99 Wn. App. 439, 994 P.2d 874 (2000), among other decisions. A total of 32 cases were filed between January 1994 and September 1995 as a result of the "sex ring" investigation.

this malpractice action against his public defenders and their law firm. The malpractice case was settled, but since the law firm and its lawyers had exhausted their malpractice insurance coverage, Mr. Hidalgo settled his case against Edward Stevensen, his principal public defender, for Mr. Stevensen's agreement to a multimillion dollar judgment that Mr. Hidalgo promised to collect only from Westport Insurance Corporation, Mr. Stevensen's insurer. The trial court found the multimillion dollar settlement amount to be excessive and that a reasonable settlement amount was $688,875, ultimately resulting in a covenant judgment against Mr. Stevensen in that amount.

Mr. Hidalgo's appeal and Westport's cross appeal raise two questions of first impression.

The first, raised by Mr. Hidalgo, is whether a trial court that has conducted one hearing at which it determines a reasonable settlement amount is statutorily required to revisit that amount if the parties reach a new and different settlement agreement. We hold that RCW 4.22.060 does not require that a reasonable settlement amount be redetermined any time the settling parties modify the terms of their agreement. The trial court did not abuse its discretion in refusing to reconsider its determination here.

The second, raised by Westport, is whether the reasonable settlement amount should bear prejudgment interest. We hold that the trial court may provide for prejudgment interest as a component of a reasonable settlement amount, as it did here. Postjudgment interest was properly awarded at the contract rate.

2

For those reasons, and because the trial court's determination of a reasonable settlement amount is supported by substantial evidence and did not require more detailed findings, we affirm the trial court.

FACTS AND PROCEDURAL BACKGROUND

Mr. Hidalgo was charged with the first degree rape and first degree child molestation of M.E., the older of two sisters whose allegations of sexual abuse by their parents and other family members ultimately led to broader allegations and charges against several dozen adults in Chelan and Douglas counties. Mr. Hidalgo was married to the girls' older half sister.

The law firm of Barker & Howard P.S., Chelan County's contract public defender, was appointed to represent Mr. Hidalgo, who was indigent. The law firm assigned the case internally to an associate attorney, Edward Stevensen. Jeffrey Barker supervised Mr. Stevensen and participated to a limited extent in representing Mr. Hidalgo.

The theory of defense that ultimately proved successful in the Wenatchee sex ring trials and postconviction challenges was to target improper interview techniques and irregularities in the investigation, particularly on the part of Robert Perez, a detective with the Wenatchee Police Department who became a foster parent of M.E. and her sister, D.E. The improper interview techniques cast doubt on the reliability of the girls' allegations.

3

Mr. Barker attended meetings of the lawyers representing defendants accused by the girls at which a defense strategy of challenging the conduct of the investigation was discussed. He did not embrace it for his firm's clients even though it proved successful very shortly before Mr. Hidalgo's trial in the trial of Honnah Sims, a Sunday School teacher who was the first of the alleged sex ring participants to be acquitted. Mr. Stevensen defended Mr. Hidalgo relying on a different theory: he acknowledged the girls' prior abuse by others, but argued that in an irrational response to it, they falsely accused virtually every adult that they knew, including Mr. Hidalgo.

Mr. Hidalgo was initially charged in April 1995 and was tried less than four months later, having agreed to one continuance but rejected Mr. Stevensen's recommendation that they seek another. The day before Mr. Hidalgo's trial was to begin, the State added charges that he had raped and molested M.E.'s younger sister, D.E. That same day, Mr. Stevensen moved for a continuance of trial but his request was denied. On the second day of trial, Mr. Stevensen informed the trial court that Mr. Hidalgo wished to substitute a private lawyer, Mr. Tyler Firkins, and that Mr. Firkins requested a two-week continuance. The request to allow the substitution of Mr. Firkins was also denied, with the trial court observing that Mr. Stevensen was "doing a good job with this defense and if [Mr. Firkins] wanted to be part of this case he had better have been here." Clerk's Papers (CP) at 2388.

4

At the conclusion of a three-day trial, Mr. Hidalgo was convicted of one count: molesting D.E. The jury deadlocked on the five remaining counts. Mr. Hidalgo was sentenced to 68 months in prison. This court upheld his conviction on appeal. *State v. Rodriguez*, noted at 86 Wn. App. 1011, 1997 WL 1110380.[2]

### Postconviction Relief

About a year into Mr. Hidalgo's incarceration, M.E., who, with her sister, had been placed through foster care in the home of Detective Perez, ran away from the Perez home to the home of her grandparents. She told her grandparents that she had lied about the sexual abuse, having been pressured by Detective Perez to make the accusations. Her grandparents arranged for the recantation to be videotaped by a television reporter. Upon being returned to the custody of the State, however, M.E. recanted her recantation.

Nonetheless, based on her initial recantation and other evidence, several defendants filed for postconviction relief. In late 1997, personal restraint petitions (PRPs) filed by M.E.'s and D.E.'s parents were referred by this court for fact-finding. Following a seven-day reference hearing Judge Wallis Friel, to whom the fact-finding was referred, concluded that M.E.'s recantation was believable and the State had used improper techniques in interviewing the girls.

---

[2] As reflected in the title of that decision, Mr. Hidalgo formerly used the surname Rodriguez. We refer to him as Mr. Hidalgo based on his current preference.

5

Following that determination and with the assistance of new lawyers—including one from Mr. Firkins's firm, which would represent him in this malpractice action—Mr. Hidalgo filed a PRP relying on newly discovered evidence and ineffective assistance of counsel. In December 1998, this court ordered a reference hearing on Mr. Hidalgo's PRP, which was referred to Judge Friel. Judge Friel found that the State had improperly influenced the testimony of M.E. and D.E. and that material evidence, sufficient to change the result, was newly discovered.

This court adopted Judge Friel's conclusions, reversed Mr. Hidalgo's convictions, and remanded the case for a new trial. *In re Pers. Restraint of Rodriguez*, noted at 98 Wn. App. 1025, 1999 WL 1314781. The State declined to retry the case and dismissed the charges.

### *The Present Malpractice Lawsuit*

Mr. Hidalgo then filed this action, asserting legal malpractice and other claims against the Barker & Howard firm, Mr. Stevensen, and Mr. Barker. The law firm and its two lawyers were insured by Westport, under a single professional liability policy with aggregate liability limits of $500,000. The policy was subject to claims arising from other lawsuits filed by defendants charged as a result of the sex ring investigation. It was a "wasting" policy (coverage limits included defense costs), meaning that every dollar spent on defending the malpractice case reduced coverage.

6

Westport hired the law firm of Lee Smart[3] to defend Barker & Howard and its partners and associates, in this case and others. Efforts at a global settlement proved unsuccessful, so the Lee Smart firm began entering into individual settlements with plaintiffs on behalf of its several clients. Mr. Hidalgo made several decreasing offers to settle with Mr. Stevensen, the last being for $75,000. The claims against Mr. Stevensen were not settled. In May 2005, after the limits of the insurance policy were exhausted, Lee Smart withdrew from representing Barker & Howard and its lawyers.

After Lee Smart withdrew, Mr. Stevensen proceeded pro se. He filed a motion for summary judgment that was partially successful but Mr. Hidalgo's claim of professional negligence survived.

Mr. Stevensen then reached an agreement with Mr. Hidalgo to settle for a $3.8 million covenant judgment. "Covenant judgment" is the term used to describe a type of judgment commonly entered into by a plaintiff who intends to collect from an insurance company that has refused, allegedly in bad faith, to settle the plaintiff's claim on behalf of a defendant whom the company insures. Typical settlement terms include an agreed judgment amount and a promise that the plaintiff will not collect its judgment from the defendant but will instead take an assignment of claims against the defendant's insurer and pursue those claims for its recovery. The Hidalgo/Stevensen settlement agreement

---

[3] At the time, the firm was called Lee Smart Cook Martin & Patterson, P.S., Inc.

7

included those terms and a provision—also common—that the settlement amount would bear interest. It included a less typical provision that Mr. Stevensen would receive one-half of any damages recovered by Mr. Hidalgo that were attributable to Mr. Stevensen's aggravation and distress. The settlement was contingent on its being approved by the court as reasonable; otherwise it was of no effect.

Mr. Hidalgo wanted to establish $3.8 million as the presumptive measure of damages for his bad faith action against Westport, so he petitioned the trial court in this malpractice case for a determination that the settlement amount was reasonable. An insured who settles a claim that his insurance company should have covered and resolved can recover damages in the amount paid to settle the claim if the settlement was reasonable and entered into in good faith. This is so even if the amount of the settlement exceeds the insured's contractual policy limits. *Besel v. Viking Ins. Co. of Wis.*, 146 Wn.2d 730, 735, 49 P.3d 887 (2002). And it is well settled that a plaintiff can obtain a judicial determination that the amount he paid in settlement was reasonable through a hearing of the sort provided by RCW 4.22.060 for determining the value of a settlement in the multiple defendant/contribution context. *Id.*; *Chaussee v. Maryland Cas. Co.*, 60 Wn. App. 504, 509-10, 803 P.2d 1339, 812 P.2d 487 (1991). Although the statutory process exists to evaluate settlements in a different context, the criteria applied—which were adopted in *Glover v. Tacoma Gen. Hosp.*, 98 Wn.2d 708, 717, 658 P.2d 1230 (1983), *overruled on other grounds by Crown Controls, Inc. v. Smiley*, 110 Wn.2d 695,

756 P.2d 717 (1988)—are designed to assure the settlement amount is fair to any third parties who are directly affected, in connection with their own liability, by the amount. Washington courts have concluded that "[i]n both settings similar concerns exist regarding the impact of a settlement on other parties and the risk of fraud or collusion." *Chaussee*, 60 Wn. App. at 512. The amount that the court determines to be reasonable following such a hearing constitutes a presumptive measure of damages in the bad faith action.

The parties' written submissions in support and opposition to Mr. Hidalgo's petition on the reasonableness of a $3.8 million settlement were voluminous. Mr. Hidalgo submitted a 35-page petition along with a supporting declaration of counsel and 42 exhibits—all told, well over 600 pages of documentation. Westport submitted a 56-page memorandum in response, supported by over 2,500 pages of additional exhibits. Mr. Stevensen submitted over 500 pages of documents in reply. Mr. Hidalgo's opening petition had addressed reasonableness against the *Glover* factors, so the parties' briefing and later argument was presented within the framework of those factors.

A reasonableness hearing lasting almost three hours was conducted in February 2009. The trial court announced at the outset of the hearing that it had read all of the briefs and had tried to read all of the exhibits that were testimonial in nature and familiarize itself with all of the others. In announcing its decision, it stated that it had considered the *Glover* factors.

At the conclusion of the hearing, the court rejected the $3.8 million settlement figure as unreasonable and disclosed how it had arrived at its own reasonable settlement amount: $688,875. Although stating it had considered all of the *Glover* factors, it explained that its conclusion ultimately "came down to a heavy emphasis on the merits of Mr. Hidalgo's liability theory and the merits of the defense theory." Report of Proceedings (RP) (Feb. 2, 2009) at 87. It found a probable range of damages that was very substantial and a probability of Mr. Hidalgo's success at trial that was quite small. From those, it performed the arithmetic.[4] It identified the ranges it had arrived at with particularity:

> As best I've been able to determine, a fair range for damages in this kind of a case with prison incarceration would be somewhere between $1,000 a day, which would be $365,000 a year, and $100,000 a month which would be 1.2 million a year. I think that's basically the range in which these cases tend to operate. If we apply those ranges to Mr. Hidalgo's roughly five and a half years of incarceration, we get on the low end of that scale 2,007,500 and at the upper end of the scale we get 6.6 million. A median figure between those two, which is unsophisticated but the best way I have to wrestle with them, is just about 4.6 million. It's actually 4,592,500. And so I believe that that is a fair figure of damages if Mr. Hidalgo prevailed entirely on his liability theory.
>
> And then the question becomes, in weighing those theories, what is the likelihood of success. Without boring you with any more detail, I will tell you that ultimately, after a great deal of thought, I decided that the liability chances are not very good, that I assessed them between 10 percent and 20 percent of prevailing in what would have been a trial setting

---

[4] In a later hearing, the trial court notified the lawyers that it had discovered a minor mathematical error in its calculation, but one that did not justify a departure from the $688,875 figure.

10

involving Mr. Hidalgo's claim against Mr. Stevensen. Well, 10 percent of that median damages figure is 459,250 and 20 percent is, of course, twice that number or 918,500. The best I could do for the purposes of this hearing was to settle on a median between those two figures, which is $688,875, and that will be the Court's conclusion as to what would be a reasonable settlement in this case. Incumbent in that conclusion is the Court's supporting conclusion that a settlement in this context of 3.8 million dollars is not reasonable.

*Id.* at 89-90.

The court went on to make several comments about matters it found significant in concluding that Mr. Hidalgo had such a low prospect of success. "Probably the most significant," it said, was the role that newly discovered evidence had played in securing Mr. Hidalgo's release. *Id.* at 90. It commented on the "somewhat theoretical nature" of Mr. Hidalgo's malpractice theory applied to only D.E. (the only victim found by the jury) as opposed to how it would apply to charges that were made by both D.E. and M.E. *Id.* It commented that at the time of Mr. Hidalgo's trial, three individuals had already been convicted based on M.E.'s and D.E.'s accusations, something that would reasonably give defense counsel pause about adopting the trial strategy that Mr. Hidalgo now argued was "clearly" the proper strategy.[5] *Id.* at 6. He observed that Mr. Stevensen had come close

---

[5] Mr. Hidalgo's lawyer has pointed out that Ms. Sims was acquitted shortly before Mr. Hidalgo's trial. Westport replies that by comparison, at least nine individuals had admitted or been convicted of sexual abuse based on the girls' allegations by that time. Br. of Resp't at 7.

to acquittals. He commented on the fact that Mr. Stevensen had tried to get a continuance, but without success.

The court did not ignore the defense case, observing that it did not find Westport's defense theories of public defender immunity and the statute of limitations to be persuasive.

At the conclusion of the hearing, the trial court directed Westport's attorneys to circulate an order. They did, but the parties thereafter reached an impasse over whether the order should contain findings and, if so, what they should be. Because Mr. Hidalgo's settlement with Mr. Stevensen was contingent on approval of the settlement amount, the settlement was void by its terms and the parties were back on a trial track. An order documenting the results of the February hearing remained in limbo.

More than a year later, in May 2010, Mr. Stevensen and Mr. Hidalgo entered into a new settlement agreement. This time, the agreed settlement amount was $2.9 million "or such amount as is found reasonable by the proper court." CP at 5333. The sharing of emotional distress damages with Mr. Stevensen was eliminated. Otherwise, the provisions largely remained the same.

Mr. Hidalgo filed a "Petition for Finding New Settlement Reasonable and/or Motion for Reconsideration of Verbal Ruling," asking the trial court to find that the agreed $2.9 million was a reasonable settlement amount. His petition was accompanied by many new supporting materials: declarations from an insurance claims adjuster, an

12

No. 30544-9-III
*Hidalgo v. Barker*

expert in lawyer conduct and ethics, an insurance defense lawyer, and a private investigator; a supplemental declaration from Mr. Stevensen; and declarations of counsel authenticating a number of additional exhibits.

Westport moved to strike the petition, arguing that as a motion for reconsideration it was untimely, having been filed well over a year after the trial court's oral ruling. It also argued that the petition did not identify a basis in fact and law for seeking reconsideration as required by CR 59(b).

In replying, Mr. Hidalgo admitted that the new materials were submitted to strengthen the showing made in support of his initial petition, stating that "plaintiff's counsel realized that for [sic] they did their client and this Court a disservice after [they] heard the Court's comments during the final reasonableness hearing that it had little experience with complex civil cases."[6] CP at 5462. The petition continued that the lawyers realized "[w]e should have supplied the Court more and better material and expert analysis, rather than relying on the Court's experience." *Id.*

Westport's motion to strike was heard in October 2011. At the hearing, Mr. Hidalgo's lawyer apologized for calling the petition and motion one for

---

[6] The trial court had stated:
I spend most of my time in criminal court because that has become the nature of rural state court work and most of the complex civil litigation happens other than in rural state courts.
RP (Feb. 2, 2009) at 85-86.

13

"reconsideration," which he now argued was a misnomer. Because the original settlement had failed, he argued that the more appropriate analysis was that the settlement Mr. Hidalgo was now presenting was different—and by the plain language of RCW 4.22.060 was required to be submitted anew. He argued alternatively that because no written order had ever been entered following the February 2009 hearing, the trial court's determination that $688,875 was a reasonable settlement amount was not final.

The court found no reason to revisit its reasonableness determination and granted Westport's motion to strike. It again directed Westport to draft the orders. It ultimately approved and signed an order on its February 2009 reasonableness determination that included no findings of fact but did append and incorporate a transcript of its oral ruling.

With Mr. Hidalgo's and Mr. Stevensen's second settlement agreement being final rather than contingent, a proposed judgment was also circulated and a new issue came to light: Mr. Hidalgo took the position that the amount determined by the court to be reasonable should bear prejudgment interest from the date of the agreement. He argued that the parties had originally agreed that their settlement would bear interest and Westport had not challenged the interest provision.

Westport argued that the principal amount of the judgment must be limited to $688,875, since it was only that amount that the court had found to be reasonable. It argued that if any interest were to be provided for by the judgment, it should be

14

postjudgment interest at the market-based statutory rate for judgments on tort claims provided by RCW 4.56.110(3)(b).

The trial court orally ruled that whether the settlement amount should bear prejudgment interest was part of determining what was reasonable in settling the claim, but a part that "[w]e simply did not address, nor was it reasonably contested." RP (Dec. 14, 2011) at 6. It ruled that it was "appropriate" that the settlement amount bear interest and provided in the judgment for prejudgment interest of $134,755 and postjudgment interest at the statutory rate of 12 percent. *Id.*; CP at 6024-25.

Mr. Hidalgo appeals, contending that the trial court erred in refusing to conduct a reasonableness hearing on the second settlement amount of $2.9 million. If that was not error, he argues that the trial court abused its discretion when it earlier found that $688,875 was a reasonable settlement amount. Westport cross appeals, arguing that the trial court erred by entering a judgment that provided for prejudgment interest and for postjudgment interest at the contract rate.

ANALYSIS

I

We first address Mr. Hidalgo's first and second assignments of error, which challenge the trial court's order that both struck and denied his petition for a reasonableness hearing on the second settlement. He argues that conducting the second hearing was either mandatory—"require[d]" by "[t]he reasonableness statute—RCW

15

4.22.060"—or, alternatively, that the court enjoyed the discretion to consider additional submissions but abused its discretion by concluding, in error, that it was bound by its initial determination. Br. of Appellant at 34 (boldface omitted). We reject both arguments, addressing, first, Mr. Hidalgo's argument that a second hearing was statutorily required.

## A. How Many Hearings Does RCW 4.22.060 Require?

RCW 4.22.060(1) provides in relevant part that

> [a] party prior to entering into a release, covenant not to sue, covenant not to enforce judgment, or similar agreement with a claimant shall give five days' written notice of such intent to all other parties and the court. . . . *A hearing shall be held on the issue of the reasonableness of the amount to be paid* with all parties afforded an opportunity to present evidence. A determination by the court that the amount to be paid is reasonable must be secured.

(Emphasis added.) As a matter of statutory construction, Mr. Hidalgo argues, "[t]he use of 'shall' is mandatory and the trial judge has no discretion to refuse to conduct a hearing." Br. of Appellant at 34 (citing *State ex rel. Nugent v. Lewis*, 93 Wn.2d 80, 82, 605 P.2d 1265 (1980) for the proposition that the use of "shall" in a statute generally operates to create a duty).

The first problem with Mr. Hidalgo's argument is in invoking RCW 4.22.060(1) as if this were a typical issue of statutory construction. The legislature was addressing contribution among joint tortfeasors in enacting chapter 4.22 RCW, not assignment of insurance bad faith claims. The only consequences of a reasonableness determination

16

that are provided by chapter 4.22 RCW are contribution claim consequences.[7] It is the Washington Supreme Court, not the legislature, that has "approve[d] *the application* of RCW 4.22.060" to covenant judgments assigning insurance bad faith claims, to which the statute would otherwise not apply. *Bird v. Best Plumbing Grp., LLC*, 175 Wn.2d 756, 767, 287 P.3d 551 (2012) (emphasis added). In the insurance bad faith assignment context, then, we apply RCW 4.22.060, but with the Supreme Court's purpose in approving its application in mind.

In invoking RCW 4.22.060 as requiring a second hearing, Mr. Hidalgo correctly argues that the statute literally requires that notice be given of every settlement. It also requires that "a" hearing be held. In construing how often the statute contemplates "a" hearing, it is important to focus on what the hearing is supposed to address. The statute does not speak of a hearing on all of the terms of the settlement agreement but, instead, of a hearing "on the issue of the reasonableness of the amount to be paid." Case law, including in the contribution context, has construed this language to narrowly confine the

---

[7] A trial court's determination of a reasonable settlement amount caps the amount that a defendant who settles all of a plaintiff's claims against multiple defendants can seek to recover from other jointly and severally liable parties, protecting those other defendants from having to bear a portion of an inflated settlement. *See* RCW 4.22.040(2). It also ensures that if a plaintiff reaches a "sweetheart deal" with one of several jointly and severally liable tortfeasors, its recovery against the others will be reduced by the judicially-determined *reasonable* amount, not some inadequate amount that the plaintiff might have agreed to accept from the released party. *See* RCW 4.22.060(2).

17

trial court's evaluation of a settlement agreement to a stand-alone reasonable settlement amount. *Glover*, for example, identified factors that for the most part will not change from one proposed settlement agreement to another, such as the released party's financial exposure, comparative fault, and litigation risk. That decision also requires the trial court to adjust the negotiated settlement amount for factors that could inflate or reduce the amount in ways that are unfair to third parties such as evidence of bad faith, collusion, or fraud.[8] If the court determines the settlement is unreasonable, RCW 4.22.060(2) has been construed to require the court to then determine a reasonable amount. *Meadow Valley Owners Ass'n v. Meadow Valley, LLC*, 137 Wn. App. 810, 817, 156 P.3d 240 (2007). That stand-alone reasonable settlement amount will necessarily be independent of other terms of the parties' agreement.

If two parties renegotiate the terms of a settlement agreement after the trial court determines a reasonable settlement amount, then, no further hearing should be required unless a different issue "of the reasonableness of the amount to be paid" is presented. Developments in the lawsuit that affect the merits of the claims, the defenses, or other *Glover* factors might result in a different issue of reasonableness. Westport's counsel

---

[8] The nine factors identified by *Glover* are (1) the releasing party's damages; (2) the merits of the releasing party's liability theory; (3) the merits of the released party's defense theory; (4) the released party's relative fault; (5) the risks and expenses of continued litigation; (6) the released party's ability to pay; (7) any evidence of bad faith, collusion, or fraud; (8) the extent of the releasing party's investigation and preparation; and (9) the interest of the parties not being released. *Glover*, 98 Wn.2d at 717.

provided an example when it argued the motion to strike:

> It would be one thing if, on Day 1, the parties settled for X amount; the Court found that unreasonable, and they went back to a trial track, and, somewhere along the line, some witness' testimony changed, some fact changed, concerning the merits of the case, and then the Court—the parties reached a new settlement, and now, all of a sudden, that new settlement's reasonable, because the facts have changed.

RP (Oct. 18, 2011 Motion Hearing) at 24. Here, though, it argued:

> None of those facts have changed, with respect to the merits of the case, from February 2nd, 2009, to today's date. The only, quote, unquote, "new evidence," is just a bunch of attorneys opining that the same facts should have led this Court to reach a different result.

*Id.*

We hold that short of a material change in one or more *Glover* factors, a new settlement agreement entered into by two parties does not require a court that has already conducted a reasonableness hearing and determined a reasonable settlement amount for those parties to entertain evidence and argument in support of revising that amount.

Here, there was no showing of a material change in any *Glover* factor. One reasonableness hearing on the parties' settlement was enough.

### B. Did the Trial Court Have Discretion to Consider Additional Evidence, But Fail to Recognize It?

If the trial court was not required to conduct a second reasonableness hearing, Mr. Hidalgo argues, it was at least not bound by its oral ruling until formally incorporated into an order, and it abused its discretion by concluding otherwise. *See Doe I v. Wash.*

19

*State Patrol*, 80 Wn. App. 296, 304-05, 908 P.2d 914 (1996) ("A court's oral ruling is not a final decision, and is not binding unless it is formally incorporated into the written findings, conclusions, and judgment."), *abrogated in part on other grounds in Yousoufian v. Office of King County Exec.*, 152 Wn.2d 421, 98 P.3d 463 (2004). A court's oral decision "is necessarily subject to further study and consideration, and may be altered, modified, or completely abandoned." *Ferree v. Doric Co.*, 62 Wn.2d 561, 566-67, 383 P.2d 900 (1963).

While it is true that an oral decision is not final and may be reconsidered or changed before it is made the subject of a final order, that does not mean that between the time a court makes and announces a decision and the time it signs an order, it is obliged to entertain whatever additional evidence or argument the parties wish to submit. *See In re Estate of Leith*, 42 Wn.2d 223, 226, 254 P.2d 490 (1953) (noting that a court could have reconsidered its oral decision, had it decided to do so, "[b]ut the court was not required to reconsider it. Decision of the question of reconsideration rested within the discretion of the court.").

Mr. Hidalgo argues that the trial court failed to recognize this discretion, but we disagree with his characterization of the court's position. As we read the trial court's ruling, it had the law right: it concluded that it was not bound by its prior determination of a reasonable settlement amount but that it had no obligation to revisit it. Although the court spoke a couple of times of "the parties" being bound by the court's oral decision,

20

we read those statements, in context, to mean only that the decision whether to revisit the reasonable settlement figure was the court's to make, not Mr. Hidalgo's or Mr. Stevensen's. RP (Oct. 18, 2011 Oral Decision) at 4.

Mr. Hidalgo also misconstrues the trial court's comment that "on a fresh look," it could possibly "find a different amount to be reasonable." *Id.* We read this as no more than the court's commonsense recognition that determining a reasonable settlement amount is never an inquiry that leads, ineluctably, to a single figure. Mr. Hidalgo's claims presented such substantial potential damages that the reasonable settlement figure arrived at from one day to another—looking at the same information, applying the same analysis, and with the same attitude about the conduct of juries—could lead to figures that were, at a minimum, many tens of thousands of dollars apart.

Mr. Hidalgo also argues that it was error for the court to impose CR 59 standards because, he argues, no written order had been entered, and CR 59 did not apply. Yet it was Mr. Hidalgo who framed his petition for the second hearing as "Petition for Finding New Settlement Reasonable and/or *Motion for Reconsideration of Verbal Ruling*" in which he stated, "Should it somehow be technically necessary plaintiff also *seeks reconsideration of the Court's verbal ruling* regarding reasonableness of the first settlement." CP at 5291-92 (emphasis added).

Mr. Hidalgo was right in initially invoking CR 59 as a potential basis for relief. While CR 59(b) states that the deadline for filing a motion for reconsideration is 10 days

21

following entry of the order, CR 59(a) states that "*any . . . decision or order* may be vacated and reconsideration granted," and provided Mr. Hidalgo with an avenue for requesting reconsideration even before entry of a final order. (Emphasis added.)

In any event, while Mr. Hidalgo introduced "reconsideration" as an alternative basis for his motion and Westport argued CR 59 standards in response, the trial court never mentioned CR 59 at all. Accordingly, whether Mr. Hidalgo's petition for a second reasonableness hearing is analyzed as having CR 59 as an alternative basis or as having identified no basis in the civil rules at all, the gist of the trial court's comments was that it saw nothing in the parties' submissions that would cause it to revisit its prior determination. This was not an abuse of discretion.[9]

## II

Mr. Hidalgo's third assignment of error is that the trial court abused its discretion when it found his first settlement unreasonable and determination that $688,875 was a reasonable settlement amount. He argues that the trial court (1) failed to explain how it applied the individual *Glover* factors; (2) ignored the eighth factor, consideration of the

---

[9] Mr. Hidalgo also contends throughout his briefing that the trial court might have gotten the ruling wrong because it had little civil litigation experience, hence the need for supplemental briefing. He misconstrues the trial court's statements about the greater amount of time it spends on criminal matters, such as the case in which Mr. Stevensen was alleged to have inadequately represented Mr. Hidalgo. At no point did this veteran trial judge question his ability to conduct the reasonableness hearing. He was highly qualified.

22

releasing party's investigation and preparation; and (3) abused its discretion by using a "rigid calculation" and selecting a figure that was the mean of the probable range of recovery rather than a higher figure. Br. of Appellant at 45. He provides no legal authority suggesting that any of the three matters he relies upon is a reversible abuse of discretion and his arguments are unpersuasive.

### A. Was the Trial Court's Explanation Inadequate?

We first address the court's alleged failure to explain its application of the *Glover* factors. We are not mystified by the trial court's oral ruling, as Mr. Hidalgo claims to be,[10] but regardless, Washington decisions do not require trial courts to explain their application of the factors.

A trial court abuses its discretion if it applies an incorrect legal standard, *Dix v. ICT Grp., Inc.*, 160 Wn.2d 826, 833, 161 P.3d 1016 (2007), but the parties in this case briefed and argued the *Glover* factors and the trial court announced that it had applied them. Absent some showing that an incorrect standard may have been applied, we do not review a trial court's reasonableness determination for a sufficient explanation, but for substantial evidence. *Water's Edge Homeowners Ass'n v. Water's Edge Assocs.*, 152

---

[10] Although, as Westport points out, Mr. Hidalgo's lawyer stated after the trial court announced its oral ruling at the conclusion of the reasonableness hearing, "[A]s a big loser, Your Honor, let me say even though I'm not happy with the ultimate conclusion the Court reached, it's hard to find fault with everything you've done." RP (Feb. 2, 2009) at 93.

Wn. App. 572, 585, 216 P.3d 1110 (2009) (a trial court is not required to specifically list, cite, or comment on the evidence it relied upon); *Sharbono v. Universal Underwriters Ins. Co.*, 139 Wn. App. 383, 400, 161 P.3d 406 (2007). "Washington courts have found a trial court's reasonableness determination to be valid even when the trial court fails to list any of the [*Glover/*]*Chaussee* factors and instead simply mentions that the parties addressed the factors in their briefs and the trial court considered the briefs." *Water's Edge*, 152 Wn. App. at 585 (citing *Martin v. Johnson*, 141 Wn. App. 611, 620, 170 P.3d 1198 (2007).

*Green v. City of Wenatchee*, 148 Wn. App. 351, 369, 199 P.3d 1029 (2009), relied upon by Mr. Hidalgo, is inapposite. This court vacated and remanded the reasonableness determination in that case for fact-finding by the trial court but it was not because written findings are ordinarily required. Rather, the trial court had erroneously treated stipulated findings between the releasing and released parties as binding. *Id.* at 368-69.

### B. Did the Court Fail to Consider Mr. Stevensen's Inadequate Trial Preparation?

Mr. Hidalgo next complains specifically that the trial court failed to consider the eighth *Glover* factor: Mr. Stevensen's lack of investigation and preparation to defend the malpractice case. Mr. Stevensen had missed witness and exhibit disclosure deadlines and failed to retain an expert witness, leaving him largely at the mercy of the far better-prepared Hidalgo legal team, according to Mr. Hidalgo. He makes this argument for the

24

first time on appeal. In the trial court, his only written submission on the eighth *Glover* factor was, "Experienced insurance defense counsel for Westport performed significant discovery and investigation prior to withdrawing after exhausting the declining limits. The chances there was some 'winning' defense that might yet be unearthed after this settlement are minimal if not nil." CP at 588.

Mr. Hidalgo's present approach of arguing that Mr. Stevensen was unprepared to defend the malpractice case is difficult to reconcile with his application of other *Glover* factors. For instance, he argued that the sixth *Glover* factor—Mr. Stevensen's ability to pay—was "either not operative or of little importance," because "any payment of the agreed judgment will ultimately come from the insurer [and] there is little doubt the insurer is fully solvent." CP at 587. In other words, he applies the sixth factor as if all of the resources of the insurance company are available to him and Mr. Stevensen. When it comes to the eighth, trial preparation, factor, though, Mr. Hidalgo wants it evaluated from the perspective of Mr. Stevensen's inadequately financed defense. We do not suggest how these factors should be analyzed, except to observe that the trial court is entitled to analyze them consistently or even discount them. In determining the reasonableness of a settlement, the trial court "must have discretion to weigh each case individually," *Glover*, 98 Wn.2d at 718, and all of the factors are not necessarily relevant in every case. *Werlinger v. Warner*, 126 Wn. App. 342, 351, 109 P.3d 22 (2005) (citing *Besel*, 146

25

Wn.2d at 739 n.2). Even *Glover* was decided without assessing all nine factors. *Adams v. Johnston*, 71 Wn. App. 599, 605 n.4, 860 P.2d 423, 869 P.2d 416 (1993).

Mr. Hidalgo has not demonstrated that the trial court committed a reversible abuse of discretion by failing to consider or misapplying the eighth *Glover* factor.

### C. Was the Trial Court's Method of Calculation an Abuse of Discretion?

Mr. Hidalgo's last challenge to the trial court's exercise of its discretion in arriving at a reasonable settlement amount is that it used a rigid calculation and selected a figure that was the mean of the probable range of recovery rather than a higher figure. "By [the court's] own determinations," Mr. Hidalgo argues, "higher amounts were in fact reasonable" and "[h]is computational method just eliminated the upper half of the reasonable range." Br. of Appellant at 45.

The trial court's approach eliminated the lower half of the reasonable range at the same time it eliminated the upper half. Its approach was rational and presumably a common approach to arriving at the reasonable settlement amount that RCW 4.22.060 requires be determined. As Westport points out, it is the approach identified by at least one treatise. 1 ALLAN D. WINDT, INSURANCE CLAIMS & DISPUTES: REPRESENTATION OF INSURANCE COMPANIES AND INSUREDS § 5:1, at 5-12 (6th ed. 2013) (explaining that the settlement value of a case can be determined by multiplying the "mid-point of the expected verdict range" by the perceived chance of a favorable verdict). There was no abuse of discretion.

III

Westport's cross appeal challenges the trial court's inclusion of prejudgment interest in the judgment, at a rate of 12 percent, for a total of $134,755. It also challenges the trial court's provision in the judgment that it would bear postjudgment interest at 12 percent per annum. The trial court based the 12 percent postjudgment rate on RCW 4.56.110(4), which provides the default postjudgment rate for judgments that are not founded on the tortious conduct of individuals or other entities. *Schrom v. Bd. for Volunteer Fire Fighters*, 153 Wn.2d 19, 36, 100 P.3d 814 (2004) held that RCW 19.52.010 mandates 12 percent prejudgment interest when the parties have not agreed on some other rate.

Westport argues that no prejudgment interest should have been awarded at all, and that postjudgment interest should have been limited to the market-based rate for judgments founded on tortious conduct of individuals provided by RCW 4.56.110(3)(b). That market-based rate—two percentage points above the prime rate—would have been 5.25 percent at the time judgment was entered.[11]

The settlement agreement ultimately binding Mr. Hidalgo and Mr. Stevensen was entered into in April 2010 and, with respect to interest, provided that the judgment to be

---

[11] *Historical Judgment Rates Archive for RCW 4.56.110(3)(a) and (b)*, WASH. ST. TREASURER, http://www.tre.wa.gov/resources/historicalJudgementRatesArchive.shtml (last visited Sept. 3, 2013).

entered "shall . . . include prejudgment interest on the unsatisfied judgment amount to run from the date of this agreement until entry and post-judgment interest from date of entry." CP at 5333. The agreement originally signed by the parties in May 2007 had included identical language. Neither settlement agreement provided for a rate of interest.

The identical issue of what *post*judgment interest rate a covenant judgment should bear was addressed in *Jackson v. Fenix Underground, Inc.*, 142 Wn. App. 141, 146, 173 P.3d 977 (2007), whose reasoning we find persuasive. While the underlying claim in *Jackson* was a tort claim as was the underlying malpractice claim here, the court in *Jackson* reasoned that the covenant judgment was not based on a determination of tort damages by a trier of fact but on the parties' agreement to settle the claim: a contract. "Once parties have agreed to settle a tort claim, the foundation for the judgment is their written contract, not the underlying allegations of tortious conduct." *Id.* We agree. The court properly awarded postjudgment interest at the 12 percent rate.

We then turn to the award of *pre*judgment interest, which we review for an abuse of discretion. *Scoccolo Constr., Inc. v. City of Renton*, 158 Wn.2d 506, 519, 145 P.3d 371 (2006).

A party's entitlement to prejudgment interest as a question of substantive law turns on whether a claim is "liquidated." *Unigard Ins. Co. v. Mut. of Enumclaw Ins. Co.*, 160 Wn. App. 912, 925, 250 P.3d 121 (2011). "A liquidated claim is one where the evidence furnishes data 'which, if believed, make it possible to compute the amount due with

28

exactness, without reliance on opinion or discretion.'" *Id.* (quoting *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wn.2d 654, 685, 15 P.3d 115 (2000)). Mr. Hidalgo's malpractice claim against Mr. Stevensen was not a liquidated claim. The $688,875 figure reduced to judgment was not an assessment of damages for malpractice but it, too, was required to be computed relying on opinion and discretion.

We do not regard the trial court as including prejudgment interest as a part of Mr. Hidalgo's judgment amount on the basis of any entitlement under substantive law, however. Rather, the trial court viewed Mr. Hidalgo's request for prejudgment interest as a component of a reasonable settlement amount. It viewed its own determination whether to award it as part and parcel of its reasonableness determination. Since the issue of interest in the event of delay had not been raised or considered at the time of the original hearing, the trial court addressed it in connection with presentment of the order and judgment, which it was free to do. *Ferree*, 62 Wn.2d at 566-67.

RCW 4.22.060(1) provides for a hearing on the issue of the reasonableness of the "amount to be paid" in a settlement agreement. Trial courts retain broad discretion in determining reasonableness and we review a trial court's determination for an abuse of discretion. *Bird*, 175 Wn.2d at 774 (citing *Mut. of Enumclaw Ins. Co. v. T&G Constr., Inc.*, 165 Wn.2d 255, 261, 199 P.3d 376 (2008)). A trial court might analyze a settlement with a view to arriving at a figure that is reasonable without the payment of interest for the period before judgment is entered. But a trial court might just as easily arrive at a

29

settlement amount that is reasonable as long as it bears interest from the date of determination. Either approach is sound and either is permissible.

In this case, the trial court was presented with a settlement agreement under which Mr. Stevensen had agreed to pay prejudgment interest. Even though that initial agreement failed and was of no effect, it was still within the trial court's discretion to arrive at a reasonable settlement amount that was premised on prejudgment interest being paid from the date a binding agreement was reached. That is what the trial court announced it was doing here. It did not abuse its discretion.

Affirmed.

_____
Siddoway, A.C.J.

WE CONCUR:

_____
Brown, J.

_____
Kulik, J.

30